762 A.2d 1057 (2000)
335 N.J. Super. 495
The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., Plaintiff-Appellant,
v.
Amerigo CHECCHIO and Romano Checchio, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 14, 2000.
Decided December 14, 2000.
*1058 Francis B. Sheehan, Montvale, argued the cause for appellant (Beattie Padovano, attorneys; Mr. Sheehan, of counsel and on the brief).
Vincent K. Loughlin, Westfield, argued the cause for respondents (Johnstone, Skok, Loughlin & Lane, attorneys; Mr. Loughlin, on the brief).
Before Judges KESTIN, CIANCIA and ALLEY.
The opinion of the court was delivered by CIANCIA, J.A.D.
This is a dispute concerning the interpretation of a commercial lease. Specifically, the question is whether the landlord or tenant is contractually obligated to pay for the repair of roof trusses and heating equipment. The tenant is appellant, The Great Atlantic & Pacific Tea Company (A&P), and the landlord/owners are respondents Amerigo Checchio and Romano Checchio (Checchios). The disputed issues were decided on cross-motions for summary judgment that were invited by the trial court. Although A&P had requested oral argument, the motions were decided on the papers. In a brief opinion of little more than two pages, the trial court set forth language from the lease and summarized some of the correspondence between the parties. The court believed the intent of A&P was "clearly set out" in a letter written by Joel Dicker, A&P's director of real estate development, approximately five months prior to the second amendment of the lease. The trial judge quoted a portion of that letter,[1] and then concluded: "It is clear to the court that Mr. Dicker intended to accept responsibility to make repairs to the building as well as the responsibility for the maintenance of the interior and exterior." With that pronouncement, summary judgment was granted in favor of the landlord and the tenant's summary judgment motion was denied.
A&P appeals contending it should have been granted summary judgment. We now reverse the order for summary judgment in favor of the Checchios, but we do not go so far as to find that summary judgment should have been granted to A&P. In our view, material factual issues are present that preclude summary disposition in favor of either party.
*1059 Initially, we note our concern over the procedure and disposition in the trial court. A good deal of material was submitted to the trial court in support of the parties' respective motions. A&P timely requested oral argument in its notice of motion for summary judgment. Such a request "shall be granted as of right." R. 1:6-2(d). No basis is set forth in the record for a relaxation of this rule and we perceive none. Indeed, oral argument before this court confirmed the value of hearing from both sides so that the respective positions can be properly understood.
Also, neither the parties nor we are well-served by an opinion devoid of analysis or citation to even a single case. Cross-motions for summary judgment do not preclude the existence of fact issues. See O'Keeffe v. Snyder, 83 N.J. 478, 487, 416 A.2d 862 (1980). The obligation to make specific findings on summary judgment motions in accordance with R. 1:7-4 has been explicitly stated in R. 4:46-2 since 1972. A trial judge is obliged to set forth factual findings and correlate them to legal conclusions. Those findings and conclusions must then be measured against the standards set forth in Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520, 540, 666 A.2d 146 (1995).
Our own review of the record indicates the following. A&P has operated a supermarket on the same premises in Fanwood continuously since 1971. The initial fifteen-year lease was entered into by A&P and a realty company that was the predecessor landlord to the Checchios. The lease contained renewal provisions that, if exercised, allowed extension through July 31, 2001. In 1983 the present parties agreed to an amendment of the lease, referred to by them as the First Amendment. The terms of that amendment are not relevant here. In December 1993, the parties entered into what is called a "Second Amendment to Lease," which, among other things, extended the lease term to November 30, 2013, with potential renewals to November 30, 2023.
The initial lease contains provisions for repairs in Article 18. In relevant part it reads:
LESSEE shall keep the interior parts of the building on the demised premises in as good repair as same are in when possession hereunder is given to LESSEE, except, without limitation, for repairs occasioned by fire, termites, the elements, other casualty or happening, unsafe condition or settling of the building, reasonable wear and tear, structural repairs, repairs to and of the heating equipment and sprinkler equipment and parts thereof, plumbing, water or sewage system, the air conditioning plant or system and repairs of an extraordinary character.... Excepting for such repairs as LESSEE has agreed to make herein, LESSOR shall make all replacements and any and all other repairs to the demised premises including, without limitation, sidewalks, and comply with all such rules, regulations and requirements; and LESSOR assumes liability for any and all damages and/or injuries... resulting from his breach of this covenant and hereby indemnifies and saves LESSEE harmless therefor.
There is no dispute that if this language were still controlling the landlord would be responsible for the repairs now in issue to the roof supports and trusses and the heating system.
The December 1, 1993 Second Amendment to the lease contains the following language in Article 8:
During the Extended Term and any Renewal Period, Tenant shall be solely responsible for all repairs and maintenance, including any necessary replacements that are required to be made to the parking lot and any repairs or replacements to the roof membrane of the store building located at the Premises; provided, however, that one-half (½) of the cost of any such replacement or capital improvement made to the roof membrane and the parking lot may be *1060 deducted from percentage rental if payable in the year that such work was performed.... Tenant may from time to time also at its sole cost and expense stripe and restripe the parking lot during the Extended Term and any Renewal Period.
It is the Checchios' contention that this language completely superseded the repair language found in Article 18 of the original lease and, therefore, the cost of repairing the heating system and roof supports is on A&P. The competing view from A&P is that the second amendments to the lease modify the prior lease terms only in certain limited respects. Although the Second Amendment expanded A&P's repair obligations, the increased duty, it is argued, went only to the parking area and the roof membrane.
A&P's motion for summary judgment was accompanied, among other things, by a certification from Joel A. Dicker, "Vice President, Development" for A&P. He indicated that he had negotiated the Second Amendment with the landlord, including Article 8, and the scope of that article was limited to the parking lot and roof membrane. He referred to a letter he had written on July 2, 1993 to the landlord, known as the "deal letter." Both sides attempt to draw strength for their respective positions from the deal letter. That letter was signed-off on as "agreed and accepted" by Amerigo Checchio. In relevant part it states:
A&P shall be responsible for the payment of taxes, insurance, and repairs and maintenance (including replacement) associated with the parking lot and roof. However, fifty percent (50%) of the cost of any replacement of the roof or parking lot may be deducted from Percent Rent, if payable, in the year the work was performed.
All other terms of the Lease will remain unchanged.
A certification submitted to the trial court by Amerigo Checchio contains the assertion that A&P's rent was reduced by $5000 a year for the first five years, with the "express understanding and intent between Mr. Dicker and myself negotiating this extension that all maintenance obligations... would then pass to the tenant in consideration of this reduced rental...." On appeal, A&P points out that the total rent under the extended lease is over $12,000,000, implying that it would make little sense to expose itself to all repairs over a potential lease term of thirty years in exchange for $25,000. We note the repairs here in issue cost approximately $38,000. We also note that if the reduced rent is the consideration for Article 8, that intent is not expressed in the Second Amendment.
The present dispute presents an interpretation question arising from a complex, integrated contract. The initial lease is detailed and set out in pages of language containing many deletions, alterations and addendums. The Second Amendment to the Lease is ten pages and clearly sets forth the continued viability of the preceding legal documents, except as amended.[2] We mention this, not because the bulk of the lease provisions are in dispute, but to emphasize the detailed and complex nature of the relationship between the parties.
In Schnakenberg v. Gibraltar Savings & Loan Ass'n, 37 N.J.Super. 150, 117 A.2d 191 (App.Div.1955), Judge Freund, writing on behalf of himself and Judges Goldmann and Conford, stated:
The principles of law pertaining to the construction of a contract as in the instant case are firmly and well established. The court will not make a different or better contract than the parties *1061 have seen fit to make for themselves. In the interpretation of a contract the intention of the parties is to be gathered from the language used in the instrument as a whole. Washington Construction Co., Inc. v. Spinella, 13 N.J.Super. 139 [80 A.2d 318] (App.Div. 1951), affirmed 8 N.J. 212 [84 A.2d 617] (1951). The situation of the parties, the attendant circumstances, and the objects they sought to attain are all necessarily to be considered by the trial court in its inquiry as to the intention of the parties. When the meaning of an integrated contract is ambiguous, the surrounding circumstances may be introduced for the purpose of elucidation. New York Sash & Door Co., Inc. v. National House, & c., Inc., 131 N.J.L. 466 [36 A.2d 891] (E. & A.1944). Even when the contract on its face is free from ambiguity, evidence of the situation of the parties and the surrounding circumstances and conditions is admissible in aid of interpretation.
"The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writingnot for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said." Casriel v. King, 2 N.J. 45 [65 A.2d 514] (1949).

Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 96 A.2d 652 (1953); Terminal Const. Corp. v. Bergen County, & c., Dist. Authority, 18 N.J. 294, 113 A.2d 787 (1955).
Accordingly, whether the clause under consideration is regarded as clear and certain, or ambiguous and uncertain, if the intention of the parties is not to be gleaned from a reading of the instrument as a whole, the plaintiff should have had the opportunity of presenting evidence of the facts and circumstances surrounding the execution of the lease.

[Id. at 155-156, 113 A.2d 787.]
Five years later, Judge Goldmann stated similarly:
The fundamental rule in construing contracts calls for the ascertainment of the intention of the parties in the light not only of the language used but also of the surrounding circumstances and the objects sought to be attained by them under their agreement. Stern v. Larocca, 49 N.J.Super. 496, 501 [140 A.2d 403] (App.Div.1958). As stated in George M. Brewster & Son v. Catalytic Const. Co., 17 N.J. 20, 32 [109 A.2d 805] (1954), in the case of an integrated contract the judicial quest "is for the reasonably certain meaning of the language used, taken as an entirety, considering the situation of the parties, the attendant circumstances, the operative usages and practices, and the objects the parties were striving to achieve.... [T]he chosen words and phrases are to be realistically assessed, in relation to the context and the obvious general purpose of the compact, for the meaning that is reasonably clear, such as is within the reasonable understanding of the symbols of expression."
[Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J.Super. 117, 121, 164 A.2d 69 (App.Div.1960).]
Contrary to the position taken by both sides in this matter, resolution of their contractual dispute requires more than just looking at the words of Article 8 in the Second Amendment and the deal letter written by Dicker. The parties should have an opportunity to present a factfinder with the circumstances surrounding the execution of the Second Amendment. The construction of a written contract is usually a legal question for the court, but where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury. Michaels v. Brookchester, Inc., 26 N.J. 379, 387, 140 A.2d 199 (1958); Garden State Buildings v. First Fidelity Bank, 305 *1062 N.J.Super. 510, 525, 702 A.2d 1315 (App. Div.1997), certif. denied, 153 N.J. 50, 707 A.2d 153 (1998).
Pursuant to Brill, supra, when the evidence is sufficiently one-sided that it may be said one party should prevail as a matter of law, summary judgment is appropriate. Where, however, the competent evidential materials, viewed in a light most favorable to the party opposing the motion, are sufficient to permit a rational factfinder to resolve disputed issues in favor of the party in opposition, summary judgment should not be granted. 142 N.J. at 540, 666 A.2d 146. In our view, the proofs in the present matter are not sufficient to justify summary disposition in favor of either party.
The judgment in favor of the defendants is reversed. The matter is remanded for further proceedings.
NOTES
[1] The text of the letter is set out infra.
[2] A portion of the Second Amendment reads: "All of the other provisions set forth in the First Amendment to Lease with respect to the premises demised to Landlord under the Business Lease shall remain in full force and effect throughout the Extended Term of this Lease..." Later in the Second Amendment it states, "As herein amended, the Lease is ratified and confirmed and remains in full force and effect."