**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0605-22

MICHAEL CARUSO,

    Plaintiff-Appellant,

v.

BOROUGH OF HADDONFIELD,

    Defendant-Respondent.

_____

Argued February 7, 2024 – Decided December 11, 2024

Before Judges Accurso, Vernoia and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-2023-20.

Charles J. Sciarra argued the cause for appellant (Sciarra & Catrambone, LLC, attorneys; Jeffrey D. Catrambone, of counsel and on the briefs).

Timothy R. Bieg argued the cause for respondent (Madden & Madden, PA, attorneys; Timothy R. Bieg and Robin Gottilla, on the brief).

The opinion of the court was delivered by

VERNOIA, J.A.D.

Plaintiff Michael Caruso appeals from an order granting defendant Borough of Haddonfield summary judgment on his Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, claim he was denied a promotion to lieutenant in defendant's police department in retaliation for engaging in whistleblowing activity. He argues the court erred by finding the undisputed facts presented in the motion record do not permit a finding he engaged in whistleblowing activity as defined in CEPA or that his purported whistleblowing activity was causally related to his failure to obtain the promotion. Based on our review of the motion record and the applicable law, we vacate the court's order and remand for reconsideration of the motion with the requirement that the court make appropriate findings of fact and conclusions of law supporting its disposition of the motion in accordance with Rule 1:7-4.

I.

We have reviewed the parties' respective Rule 4:46-2 statements and, to the extent necessary to provide context for our disposition of the issues presented on appeal, summarize some of the proffered facts in a light most favorable to plaintiff as the party opposing defendant's summary-judgment

motion.[1]  Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 71 (2024); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

Our summary of some of the pertinent facts is based on our consideration of defendant's 125-paragraph Rule 4:46-2 statement of material facts filed in support of the summary-judgment motion and plaintiff's "Opposition to Statement of Material Facts," which includes responses to defendant's statement as well as additional proffered facts supported by citations to the record.  We have not considered the numerous factual assertions made by the parties in their respective briefs on appeal that were not presented to the motion court in their Rule 4:46-2 statements, even where the newly asserted facts are supported by exhibits and certifications otherwise submitted to support the factual assertions included in the parties' Rule 4:46-2 statements.  To do otherwise, would

---

[1] Our summary of the facts based on the motion record is neither intended to be exhaustive nor binding on the motion court on remand.  As we explain, the motion court did not make findings of what it had determined to be undisputed material facts based on an analysis of the parties' Rule 4:46-2 statements, and that must be done by the motion court in the first instance.  Our summary of the purported facts is not a substitute for that required analysis, which shall be performed by the court on remand.  Again, we summarize only some of the purported facts for the purpose of providing context for our analysis and determination that a remand to the court for reconsideration of defendant's motion is required.  On remand, the motion court shall independently review the parties' Rule 4:46-2 statements and make its determination of the undisputed material facts in accordance with the Rules and applicable precedent.

impermissibly require that we ignore the requirements and purpose of Rule 4:46-2, decide the matter on a record—and purported undisputed facts—that were not properly presented to the motion court, and deny the opposing party an opportunity to respond to any newly asserted material facts in the manner permitted under Rule 4:46-2.

We therefore do not accept or consider as purported facts those set forth for the first time in the parties' briefs that were not included in the parties' Rule 4:46-2 statements, even if supported by citations to deposition transcripts that were included in the summary-judgment record presented to the motion court. We find no authority in our rules governing summary-judgment motions permitting a party who includes a lengthy deposition transcript in its submissions to the motion court as support for a few isolated facts in their Rule 4:46-2 statement to then, for the first time on appeal, cite other portions of the transcript to support on appeal newly asserted purported facts that were not included in the Rule 4:46-2 statements in the first instance. The parties must present their alleged undisputed facts, and their opposition to the proffered facts, in accordance with Rule 4:46-2. That opportunity begins and ends in the motion

A-0605-22

court absent an appropriate motion, which was never made here, to expand the record on appeal.[2]

Defendant hired plaintiff as a police officer in 2009 and promoted him to corporal in 2016 and sergeant in 2017. In February 2019, plaintiff was one of four sergeants interested in a promotion to an open lieutenant's position in defendant's police department. The other interested individuals were Sergeants Scott Leverick, Danielle Mueller, and Stuart Holloway. By February 13, 2019, defendant had assigned plaintiff and those other sergeants to "two-month stint[s]" as acting lieutenants. Plaintiff understood the temporary assignments were intended to provide the sergeants with an opportunity to decide if serving as a lieutenant "was a good fit for them or not."

While serving as an acting lieutenant on February 13, 2019, plaintiff heard a call over the radio from Haddonfield police officer Joni Frangieh requesting a supervisor at the home of Haddonfield Borough Commissioner Jeffrey Kasko. Frangieh had responded to the residence to address a report that Kasko had

---

[2] Because we remand for reconsideration of defendant's motion for summary judgment, we do not preclude the parties from requesting that the motion court allow resubmission of <u>Rule</u> 4:46-2 statements to include additional purported material undisputed facts, supported by competent evidence, including those that were not included in the original statements but were asserted in the parties' factual claims raised for the first time in their briefs on appeal.

A-0605-22

driven recklessly out of his driveway and struck a vehicle that had been driven by a process server who had attempted to serve Kasko with papers in his then-pending divorce case. Plaintiff reported the call to Lieutenant Stephen Camiscioli and they drove together to Kasko's home.

When they arrived, plaintiff saw Haddonfield Police Department Corporal Jose Ortiz in the driveway speaking with Kasko. Lieutenant Camiscioli joined that conversation while plaintiff spoke with Frangieh, who explained he had gone to Kasko's home to investigate a hit-and-run accident and had been informed by the process server that Kasko had first run into his house when she attempted to serve him with papers related to his divorce proceeding. The process server told Frangieh that Kasko had then exited the home through a side door, entered his vehicle, backed his vehicle into the process server's vehicle, and fled the scene.

Officer Frangieh also reported to plaintiff that Kasko had returned to the scene, the process server identified Kasko and his vehicle, and Frangieh had ordered Kasko to "stop, stop, stop" as Kasko approached the home in his vehicle. The officer further advised plaintiff that Kasko had disregarded his instructions and drove the vehicle onto the home's driveway, ignored the officer's directive that he "stop," and hit the officer's hip and duty belt with such force that it

6

scratched Kasko's vehicle's mirror, causing the mirror to retract. Officer Frangieh reported to plaintiff that Kasko had then locked the vehicle's doors and refused repeated commands he exit the vehicle. Kasko eventually relented and exited his vehicle.

Plaintiff separately spoke with the process server, who reported that she had tried to serve Kasko with paperwork. She further told plaintiff, "Kasko was a maniac and . . . was really rude" and he had flown "out of his driveway and struck [her] vehicle and drove away."

Plaintiff informed Lieutenant Camiscioli about the information Frangieh had provided and said Kasko should be arrested. According to plaintiff, during his conversation with Lieutenant Camiscioli, they were "[b]asically putting the pieces together" based on what they had respectively heard from the witnesses, and Lieutenant Camiscioli testified that while he was "getting all the facts," plaintiff "was . . . advocating for Kasko's arrest."

According to plaintiff, Lieutenant Camiscioli asked if plaintiff thought there was probable cause to arrest Kasko for assaulting Frangieh, and plaintiff responded in the affirmative. Plaintiff said he believed there was probable cause based on the totality of the circumstances, including "undocumented grapevine talks of Kasko and his wife," the information from the process server, Frangieh's

7

statement to plaintiff, and a prior "abnormal missing person's report" concerning Kasko that had been filed. Plaintiff later testified there was probable cause to arrest Kasko based on Frangieh's statement Kasko had struck him with Kasko's vehicle and the process server's statement that Kasko had struck her car and fled the scene. Plaintiff also testified he did not have to hear Kasko's version of the events to make his probable cause determination.

Plaintiff testified Lieutenant Camiscioli was "taken aback" by plaintiff's suggestion Kasko should be arrested. Plaintiff also explained that while he initially spoke with Lieutenant Camiscioli, Corporal Ortiz was inside the residence with Kasko. Plaintiff further testified that during his conversation with Lieutenant Camiscioli, they discussed an incident that had occurred a few weeks earlier during which Kasko "came up missing and these events [were] starting to occur and, you know, we didn't know what's being said inside the residence between Kasko and [Corporal] Ortiz."

During their conversation, plaintiff also reported to Lieutenant Camiscioli what Frangieh had said about the incident in the driveway at Kasko's home during which Frangieh had been struck by Kasko's vehicle. Plaintiff testified that he could not recall "if [Lieutenant] Camiscioli advised him of

what . . . Kasko [had] related" to him about that incident when the lieutenant first spoke to Kasko outside of plaintiff's presence after arriving at the scene.

After plaintiff and Lieutenant Camiscioli spoke, Corporal Ortiz exited Kasko's house and the three officers huddled to discuss what had transpired. According to plaintiff, Corporal Ortiz stated that Kasko was going through "a rough time" and Kasko had said he hadn't seen Frangieh as he drove up the driveway. Corporal Ortiz also said he wanted to see the recording of the incident from the recording device in Frangieh's patrol car.

In his opposition to defendant's summary-judgment motion, plaintiff argued that while at the scene of the incident Lieutenant Camiscioli conjured up the notion that Kasko had "jumped in" front of Kasko's vehicle. Plaintiff further asserted Lieutenant Camiscioli had done so as a means of establishing a false reason not to find probable cause to arrest Kasko. Indeed, in his Rule 4:46-2 statement, plaintiff asserts Lieutenant Camiscioli suggested the "fabrication" that Frangieh had "jumped in" front of Kasko's vehicle as the "mechanism" he and "Corporal Ortiz were using to try to prevent the charging and arrest of Kasko." Citing Frangieh's deposition testimony, plaintiff further asserts

Lieutenant Camiscioli suggested to Frangieh that Frangieh had walked into Kasko's car.[3]

Frangieh testified he saw plaintiff, Lieutenant Camiscioli, and Corporal Ortiz conferring and then Lieutenant Camiscioli approached him and asked if he "walk[ed] into the car" and was he "around the car, something to that extent." In response, Frangieh testified that he showed Lieutenant Camiscioli the recording from his patrol car. Frangieh generally described what the recording of the incident showed and explained that Lieutenant Camiscioli watched the video and spoke again to plaintiff and Corporal Ortiz.

According to Corporal Ortiz, he had determined based on his conversation with Kasko that Kasko had asked Frangieh to move from the center of the driveway, but Frangieh had refused and continued to order Kasko to stop. While at the scene, Kasko had demanded that Corporal Ortiz call Haddonfield Police Chief Jason Cutler. During the call with Chief Cutler, Corporal Ortiz reported

---

[3] We point out the claims asserted in plaintiff's statement of material facts solely to provide context for our decision to vacate the summary-judgment order and remand for the court's careful consideration of the parties' Rule 4:46-2 statements in the first instance. Our reference to plaintiff's assertions shall not be construed as a determination that we have found that they are supported by competent evidence as required under Rule 4:46-2(a) and (b) or that they were not properly disputed in accordance with the Rule. Those determinations must be made by the remand court.

that Frangieh had refused to move from the center of the driveway, so Kasko "went around him, and his mirror made contact with Officer Frangieh."

Lieutenant Camiscioli separately spoke over the phone with Chief Cutler, who said the officers had to arrest Kasko. Chief Cutler testified during discovery that the call from Lieutenant Camiscioli was "an advisory," letting him know what was going on in the event he was later questioned by the Borough's commissioners. After speaking with Lieutenant Camiscioli, Chief Cutler, who had been traveling to a meeting when he had spoken with Corporal Ortiz and the lieutenant, changed course and responded to the Haddonfield Police Department.

In deposition testimony, Lieutenant Camiscioli testified that while at the scene he had asked Corporal Ortiz and plaintiff what they thought had happened because there "was a discrepancy in the claims that Officer Frangieh stepped in front" of Kasko's car. Plaintiff asserts there was never such a discrepancy because Corporal Ortiz had testified that Kasko never said Frangieh had stepped in front of his car.

Plaintiff testified that while at scene he was steadfast in stating there was probable cause to arrest Kasko, and he had determined Lieutenant Camiscioli and Corporal Ortiz were searching for a basis to give Kasko the benefit of the

doubt. During his deposition, however, plaintiff was asked if there was "anything inappropriate about [Lieutenant] Camiscioli and [Corporal] Ortiz kind of talking through the incident, trying to figure out what happened?" and, in response, plaintiff testified, "No, that's not inappropriate."

Pursuant to Corporal Ortiz's suggestion, the three officers reviewed the video of the recording from Frangieh's patrol car but the contact between Kasko's vehicle and the officer was obscured by a tree. Lieutenant Camiscioli testified he wanted to process the "totality" of the situation to ensure he was making the right decision to arrest Kasko. He explained he did not "really think highly" of Kasko but wanted to make sure Kasko was treated fairly. While at the scene, the officers allowed Kasko to enter his home alone and he was not handcuffed. Lieutenant Camiscioli later acknowledged they should have handcuffed him.

After they reviewed the recording from Frangieh's patrol car, the officers placed Kasko under arrest. Plaintiff claimed Lieutenant Camiscioli had delayed the arrest and relented only because he had insisted that "all that was needed" for the arrest was Frangieh's statement about what had occurred.

Lieutenant Camiscioli testified that he ordered plaintiff to go with Corporal Ortiz and Kasko into Kasko's home and for Corporal Ortiz to wear a

"patrol vehicle recording device" because the corporal had access to a device in his assigned patrol vehicle. Lieutenant Camiscioli also did not want any "corruption, anything thrown under the rug, things that weren't said." During discovery, plaintiff disclosed for the first time that he had used his personal cell phone to record the conversations that took place while he and Corporal Ortiz were in the home with Kasko. Plaintiff did not advise anyone that he was recording what was said in the home.

Plaintiff testified he made the recording in case Corporal Ortiz's recording device did not work and because he "wasn't participating in any corruption," which he explained referred to "not charging Kasko the way he's supposed to be" and "[a]ny secret conversations that would be held between" Kasko and Corporal Ortiz while in the home.[4] Other evidence produced during discovery

---

[4] It was not until February 8, 2021, when plaintiff served discovery responses in this matter, that plaintiff disclosed for the first time that he had used his personal cell phone to record conversations on February 13, 2019. Plaintiff never identified his recordings in a police report related to the Kasko incident and arrest and testified that did not have an obligation to turn the recordings over to the police department or Kasko's defense counsel because, in plaintiff's view, the recordings were duplicative of any recordings made by Ortiz's recording device. Plaintiff further testified that Haddonfield Police Department policies required that all personal cell phones be turned off while officers "respond[ed] to and handl[ed] calls for service." Plaintiff testified the policy permitted supervisors to use personal cellphones and he was acting as supervisor—a lieutenant—during the Kasko incident. Plaintiff also testified that

revealed that Corporal Ortiz was at that time seeking support from the Borough's Commissioners, including Kasko, for the Borough "to pay off something to do with his pension so he [could] retire early."

Plaintiff testified the interactions he secretly recorded while in Kasko's home did not include any evidence of corruption. The recordings did capture a conversation between plaintiff and Sergeant Mueller occurring eighteen minutes after Kasko's arrest during which plaintiff told her he "had to keep pushing" Lieutenant Camiscioli and Corporal Oritz and "he would not lay off and that we are locking [Kasko] up." Sergeant Mueller is also heard on the recording stating the reason Kasko "is getting locked up is because [plaintiff] is there." On the recording, plaintiff states that Lieutenant Camiscioli had "resist[ed]" arresting Kasko, and Mueller states that Lieutenant Camiscioli had told her that Corporal Ortiz "was trying to sweep the matter under the rug."

---

although the police department's policies required the collection and preservation of evidence, he did not consider his personal recordings during the Kasko incident to constitute evidence, explaining "there was nothing of evidential value on that recording" because it was "redundant" of Corporal Ortiz's recordings. Plaintiff also testified that while on duty on February 15, 2019, he made two additional personal recordings of calls he had with Kasko concerning a temporary restraining order, even though he otherwise had a recording device in his patrol vehicle. Plaintiff asserts he was an acting supervisor on that date and therefore did not need approval from a regular lieutenant or Chief Cutler to record the conversations.

Plaintiff's personal recordings also included statements he made to Kasko while in Kasko's home following his arrest. Plaintiff told Kasko, "We're going to make this as painless as possible," "You don't need any added crap on your shoulders," and it was "okay" for Kasko "to make phone calls from the back of the patrol car." Plaintiff testified he made the statements because he tried "to give sympathy to the suspect . . . to allow [Kasko] to continue to stay cool [and] calm" while he was processed.

Lieutenant Camiscioli asked plaintiff to accompany Corporal Ortiz in his patrol car while transporting Kasko to the police station. Lieutenant Camiscioli made the request because he did not want any corruption or side deals being made, explaining Corporal Ortiz and Kasko should not be left alone together. Plaintiff testified that up until Lieutenant Camiscioli said he wanted plaintiff to watch over Corporal Ortiz, Lieutenant Camiscioli had not done anything to which plaintiff objected. Plaintiff, however, also testified that "at the very beginning when [they were] talking and discussing the circumstances that happened," Lieutenant Camiscioli and Corporal Ortiz "were pushing for the fact that Kasko wasn't in any wrongdoing."

Plaintiff testified that he told Corporal Ortiz that Kasko must be remanded to the County jail as the result of the arrest, stating the remand was mandatory.

15

Plaintiff also testified Corporal Ortiz responded that they could charge Kasko on a complaint-summons instead of a complaint-warrant, meaning Kasko would not be remanded to the County jail. According to plaintiff, while they were at the police station processing Kasko's arrest, Corporal Ortiz called the court administrator, Jean Phillips, who was to be involved in processing the complaint, but plaintiff could not hear what the corporal said. Suspicious Corporal Ortiz had tried to arrange special treatment for Kasko, plaintiff later called Phillips, who reported that Corporal Ortiz had requested the complaint against Kasko be placed on a summons.[5] Phillips testified it was up to the judge to decide whether the complaint "goes on a summons or a warrant," and she did not recall if Corporal Ortiz had tried "advocating one way or the other."

Lieutenant Camiscioli testified he had confirmed that after Corporal Ortiz spoke with Phillips, plaintiff advised Corporal Ortiz and the lieutenant that Kasko must be charged on a complaint-warrant because, according to plaintiff, all suspects charged with aggravated assault on a police officer must be temporarily detained under the Criminal Justice Reform Act, N.J.S.A. 2A:162-15 to -26, to allow Pretrial Services to conduct an assessment and issue a recommendation concerning pretrial release. Plaintiff contacted Phillips to

_____

[5] Phillips also testified that Corporal Ortiz had never made such a request.

16

ensure plaintiff was charged on a complaint-warrant and, as it turned out, Kasko was charged on a complaint-warrant and remanded to the county jail as a result. Plaintiff also advised Chief Cutler that Kasko was to be remanded to the county jail and, according to plaintiff, the Chief said, "are you kidding me, he can't go to jail."

Following Kasko's arrest, plaintiff spoke with Corporal Ortiz, who was with officer John Burger, and told the corporal he must complete a NJTR-1 crash report concerning the Kasko incident. Corporal Ortiz and Burger responded that the report did not "have to be done." Plaintiff then spoke with Chief Cutler, explained what Corporal Ortiz and Burger had said, and showed the Chief a manual requiring the report. In response, the Chief said, "yeah, they got to do it."

Chief Cutler testified that plaintiff had asked him if the report was required, and he told plaintiff there were two schools of thought on the issue: first, that the report is unnecessary when there is otherwise an investigation report that is done for an intentional crime; and second, the report is required even if it is redundant of the investigation report. To "[m]ake sure that the facts of the case" involving the Kasko incident were "there," plaintiff signed off on

the investigation report Corporal Ortiz had prepared concerning the February 13, 2019 incident.

Plaintiff testified Corporal Ortiz's initial draft of the NJTR-1 crash report was inadequate and "missing the meat of the report, which was the intent." He brought the inadequacies to Corporal Ortiz's attention, and the corporal changed the report. Plaintiff testified he believed the initial draft of the report violated N.J.S.A. 2C:28-7, and he had refused to participate in any action that would have resulted in the submission of a false police report.[6]

Plaintiff alleged he later passed a break room at the police station and heard Corporal Ortiz say, "a man like that shouldn't have to go through that," which plaintiff understood as a criticism of the manner in which plaintiff had handled the Kasko arrest. According to plaintiff, during the same conversation, another officer said plaintiff had committed "career suicide" for his handling of Kasko's arrest.

Plaintiff testified Chief Cutler was upset about the fact that Kasko was going to the county jail, but that the Chief's statement, "are you kidding me, [Kasko] can't go to jail," did not violate any police department policies. Plaintiff

---

[6] In relevant part, N.J.S.A. 2C:28-7(a) provides that a person commits a criminal offense by knowingly making a false entry in any record, document, or thing kept by the government for information or record.

A-0605-22

also testified Corporal Ortiz was sympathetic to Kasko because the corporal was also going through a divorce.

As noted, plaintiff's acting-lieutenant duties in February 2019 had been assigned as a part of process through which he sought a promotion to the position of lieutenant. The Haddonfield Police Department policy governing promotions provides that the Chief of Police administers the promotion process and reports the results to the Director of Public Safety, who is responsible for promotions in the department.

The department's promotion policy for the position of lieutenant provides that the evaluation of a candidate is based on an assessment of five weighted components: (1) an oral examination that is assigned a thirty-percent weight; (2) performance reviews weighted at twenty percent; (3) a command staff review weighted at thirty-five percent; (4) seniority weighted at ten percent; and (5) education weighted at five percent.

Under the policy, the command staff review is performed by the "[l]ieutenants" who "evaluate the candidate in three core areas of competence, reliability, and teamwork with a maximum [twenty-four] point score." The points awarded to a candidate in the core areas of competence are then divided

by twenty-four to create a "percentile" that is multiplied by the "weight percentile to equal the adjusted command staff point total."

Lieutenant Camiscioli testified the purpose of the command staff review is to look for "work ethic improvement, absenteeism rate, and basically demeanor as well too." He also noted that a candidate's "support of management" is considered, explaining the department did not "want a clone," but "we also don't want someone who is going to potentially, you know, always throwing a monkey wrench into things as well."

As noted, there were four candidates for the lieutenant's position, and only the candidates receiving the top three total scores were eligible for the promotion. Based on the Score Sheet used by defendant to determine the candidates' eligibility for the promotion, plaintiff received the lowest final total score and therefore was ineligible. Of the three other candidates who remained eligible, Chief Cutler recommended Sergeant Holloway, who had the highest score on the Score Sheet, for the promotion and defendant promoted Sergeant Holloway to lieutenant.

On the Score Sheet, plaintiff had the highest score (22.665) on the oral examination, which was conducted by the State Chief's Association, an organization that is unaffiliated with the Haddonfield Police Department.

Plaintiff also had the highest score, a five, for education. Holloway scored a 20.247 on the oral examination and three-and-one-half points for education.

Based on defendant's Score Sheet, plaintiff received the lowest grades by a substantial margin on the command staff review, which was conducted solely by Lieutenant Camiscioli.[7] Plaintiff received 17.50 points while Sergeant Mueller scored 27.71, Sergeant Leverick scored 29.17, and Sergeant Holloway, who received the promotion, had the highest score, a 30.63.

Plaintiff also scored lowest for seniority and was awarded 4.03 points.[8] Sergeant Holloway received 7.47 points, Sergeant Muller received 7.23 points, and Sergeant Leverick received 7.77 points. Thus, plaintiff had substantially less seniority than the other candidates.

---

[7] We recognize Lieutenant Camiscioli testified the command staff review had been conducted by himself and Chief Cutler, but there are no asserted facts in the parties' Rule 4:46-2 statements establishing for purposes of the summary-judgment motion that Chief Cutler participated in the grading of the candidates in the twelve categories of performance, or calculated and tallied the points for each of the candidates used on the Score Sheet to rank the candidates.

[8] The seniority scores were derived from a mathematical formula based on the number of months the candidate had worked with the police department.

All candidates received the same number, twenty, of points for discipline.[9] Sergeant Leverick received sixteen points in the performance evaluation category, and the three other candidates were awarded twenty points. The Chief awarded plaintiff and Sergeants Holloway and Mueller twenty points because some of their prior performance evaluations had either been destroyed due to a burst pipe in the Chief's office or could not be located. The Chief awarded Leverick sixteen points based on his prior evaluations because they had been located.

Thus, plaintiff received a total of 89.20 points and, as noted, Sergeant Hollway, who had received the highest total—101.84 points—was promoted. Sergeant Leverick totaled 91.43 points and Mueller totaled 90.39. Again, because plaintiff had received the lowest number of points, and was not among the top three of the candidates, he was deemed ineligible for the promotion.

Chief Cutler testified plaintiff had the highest total score following the oral examination but then fell to the fourth place in the scoring total following the command staff review. In his Rule 4:46-2 statement, plaintiff asserted that "the command staff criteria were a carryover from [plaintiff's] prior performance

---

[9] The scores in the discipline category were based on a review of the cumulative disciplinary record of each candidate.

evaluations" and cited to Chief Cutler's deposition testimony as evidence supporting that contention.

The system used during the command staff review included a rating assigned by Lieutenant Camiscioli for each candidate in twelve performance-quality categories. The available ratings are "Excels/Acceptable+," "Acceptable/Acceptable+," "Needs Improvement," and "Unacceptable," and there is a numerical score associated with each. A candidate received two points for an "Excels/Acceptable+," one point for an "Acceptable/Acceptable+," a minus-one-point for a "Needs Improvement," and a minus-two-points for an "Unacceptable." Thus, the maximum number of points a candidate could receive on the command staff review is twenty-four. As noted, to obtain the command staff review score, the total number of points received is first divided by twenty-four and then multiplied by thirty-five to provide the command staff review points that were included in the calculation of each candidate's total scores considered for the promotion.

A similar mathematical rubric had been used by defendant, at least in part, during the four sergeants' prior annual performance reviews.[10] Evidence

---

[10] The parties' Rule 4:46-2 statements do not describe, and are not supported by, plaintiff's or any other of the candidates' annual performance evaluations such

presented to the motion court established that in his annual performance review for the 2017 calendar year, plaintiff had received either "excels" or "acceptable plus" scores in seventy-five percent of the graded categories. In the 2019 command staff review for the promotion to lieutenant, plaintiff did not receive any "excels" or "acceptable plus" ratings in any of the twelve categories assessed.[11] Plaintiff's annual performance evaluation for the 2018 calendar year was not produced because, as noted, according to Chief Cutler it had been destroyed as the result of a water-pipe leak in his office or otherwise could not be located.

The command staff reviews were conducted solely by Lieutenant Camiscioli at Chief Cutler's request. Chief Cutler testified he would have performed the command staff reviews based on the candidates' performance during their two-month temporary acting-lieutenant assignments and their prior

---

that it is possible to compare the categories assessed on those evaluations with those measured on the command staff review for the promotion to the lieutenant position.

[11] The two command-staff-review scoring sheets that are referenced in the parties' Rule 4:46-2 statements and included in the motion record include "excels" or "acceptable+" as possible grades for the candidates' performance in the measured categories. The command staff review scoring sheets included in the record are titled "Promotional Candidate Service Record Review" and are for Sergeants Mueller and Leverick. Plaintiff's is not included.

A-0605-22

performance as sergeants, but he did not direct Lieutenant Camiscioli as to the manner in which he should perform the reviews. Lieutenant Camiscioli testified he based the command staff reviews on the candidates' performance during their temporary two-month acting-lieutenant assignments and did so pursuant to instructions from the Chief.

During the portion of Lieutenant Camiscioli's deposition cited in plaintiff's Rule 4:46-2 statement, plaintiff's counsel points out that on plaintiff's command staff review record, there is a check in the "needs improvement" box "near 'absenteeism'" and that an unidentified box included two checkmarks.[12] Lieutenant Camiscioli responded to counsel statement, stating, "There was heavy absenteeism."

Lieutenant Camiscioli testified he had reviewed plaintiff's performance evaluations for the period prior to the temporary acting-lieutenant assignments but he had found plaintiff had not excelled in any of the graded performance categories during the two-month temporary assignment as acting lieutenant. The

---

[12] Plaintiff's command staff review record was marked as an exhibit at the lieutenant's deposition and is referred to in testimony plaintiff cites in support of his Rule 4:46-2 statement, but it is not included in the record on appeal. See R. 2:6-1(a)(1)(I) (requiring that appellant in a civil action include in the appendix on appeal such parts of the record as are essential to a proper consideration of the issues presented).

lieutenant, however, testified that "everything plaintiff did was acceptable to" him. The lieutenant otherwise confirmed the command staff review record he had completed for plaintiff awarded a total of twelve points, a score that is consistent with an acceptable rating in all twelve graded categories despite the check near the "needs improvement" box for absenteeism.

In his Rule 4:46-2 statement, plaintiff asserts Chief Cutler had testified plaintiff's absenteeism had been due to a work-related injury. The Chief also testified he lacked knowledge concerning plaintiff's absenteeism because he did not "have the record in front of" him and he could not "answer if" plaintiff's absenteeism "was excess overuse or not." The parties' Rule 4:46-2 statements do not otherwise include any purported facts related to plaintiff's absenteeism.

The Score Sheet Lieutenant Camiscioli prepared to show the results of the command staff review contained errors, including a significant error that rendered plaintiff ineligible for the promotion. More particularly, although Sergeant Mueller had received thirteen points on the command staff service record review based on the mathematical rubric, Lieutenant Camiscioli's Score Sheets summarizing the candidates' results showed Sergeant Mueller had received nineteen points. If the score sheet had properly calculated Sergeant Mueller's total points based on the thirteen points she had actually received on

the command staff review, her total command staff review points would have totaled 18.958 points instead of the 27.71 Lieutenant Camiscioli had used on the Score Sheet to obtain Sergeant Mueller's final score of 90.39. If the lieutenant had used the proper score of 18.958 points for the command staff review, Sergeant Mueller's final total score would have been 61.64, placing her in fourth place among the candidates and moving plaintiff into third place thereby rendering him eligible for the promotion.[13] During his deposition testimony, Lieutenant Camiscioli testified he had no explanation for the error in the statement of Sergeant Mueller's command staff review score and points as set forth on the final score sheet that was used to rank plaintiff last and ineligible among the four sergeants that had applied for the promotion.

In his opposition to defendant's summary-judgment motion, plaintiff also pointed to evidence that Lieutenant Camiscioli had testified he had made notes during the command staff performance reviews, but those notes were no longer available during the litigation. Plaintiff further noted that Lieutenant Camiscioli

---

[13] We calculated Sergeant Mueller's command staff review points of 18.958 by using the correct number of points—thirteen—Lieutenant Camiscioli had awarded based on the point system for the twelve graded areas of performance. In accordance with the command staff review rubric, we divided thirteen by twenty-four, which yielded .54, and we multiplied .54 by thirty-five, which yields 18.958.

had testified Sergeant Holloway, who had received the promotion, had been cooperative with the police department during his tenure as an officer.

In the Rule 4:46-2 statements, plaintiff admitted he claimed defendant had failed to promote him to the position of lieutenant in retaliation for his objection to his complaints about Kasko's arrest and his refusal to participate in a violation of law or public policy when it appeared Lieutenant Camiscioli and Corporal Ortiz were not going to arrest Kasko for an aggravated assault on a police officer, Frangieh, and when Corporal Ortiz sought to have Kasko charged in a complaint-summons instead of a complaint-warrant. Plaintiff further admitted he had claimed he had an objectively reasonable belief the lieutenant and corporal were knowingly refraining from the performance of a duty imposed by law in violation of N.J.S.A. 2C:30-2.[14]

---

[14] N.J.S.A. 2C:30-2 provides in pertinent part as follows:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
>
> a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner; or

After hearing argument on defendant's motion, the court rendered an opinion from the bench. The court briefly summarized some of plaintiff's factual allegations and generally set forth the legal principles applicable to deciding a summary-judgment motion on a CEPA claim. The court found that the first issue to be decided was whether plaintiff had presented sufficient "evidence of whistleblowing." The court then found that issue presented the "question" of whether plaintiff had "reported to somebody what he believed to be illegal or unethical workplace conduct."

The court concluded plaintiff had not engaged in whistleblowing activity because although he had expressed an opinion at Kasko's home that Kasko should be arrested, it was otherwise appropriate for Lieutenant Camiscioli and Corporal Ortiz to view the recording of the incident involving Frangieh and Kasko before making the arrest decision.

The court further noted that plaintiff had not engaged in whistleblowing when he contacted the court administrator to explain Kasko should be arrested

---

b. He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.

. . . .

on a complaint-warrant because the clerk did not make the decision as to how Kasko should be charged. According to the court, "while [p]laintiff may have complained or vented, . . . based on the description it sounded to be more like a [venting] rather than a complaint" to a person who "was not in upper management." The court then noted that plaintiff "never filed a complaint because – in part – in large part because [the court] suspected Kasko was in fact arrested."

The court also reasoned there was insufficient evidence plaintiff had engaged in whistleblowing activity under CEPA because "plaintiff was asked his position and voiced that position." The court further found plaintiff had failed to present sufficient evidence his purported whistleblowing activity was causally connected to defendant's decision to promote Sergeant Holloway instead of plaintiff to lieutenant, noting Sergeant Holloway had greater seniority than plaintiff.

The court entered an order granting defendant summary judgment. This appeal followed.

## II.

We review a grant or denial of summary judgment de novo, applying the same legal standard as the trial court. Crisitello v. St. Theresa Sch., 255 N.J.

200, 218 (2023). That standard requires that a court "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "We owe no deference to conclusions of law that flow from established facts." Crisitello, 255 N.J. at 218.

Rule 4:46's requirements are "designed to 'focus [a court's] . . . attention on the areas of actual dispute' and [to] 'facilitate the court's review' of the motion." Claypotch v. Heller, Inc., 360 N.J. Super. 472, 488 (App. Div. 2003) (second alteration in original) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 1.1 on R. 4:46-2 (2003)). Under Rule 4:46 a motion court is required to consider the facts in the light most favorable to the non-moving party by reviewing the parties' statements of material fact, deciding which facts are

undisputed, determining whether disputed facts are material, and analyzing whether the undisputed facts permit entry of a judgment in the moving party's favor as a matter of law. See e.g., Kenney v. Meadowview Nursing & Convalescent Ctr., 308 N.J. Super. 565, 573 (App. Div. 1998) (finding a court must decide a summary-judgment motion based on the "factual assertions . . . that were . . . properly included in the motion [for] and [in opposition to] . . . summary judgment" in accordance with Rule 4:46-2).

"In light of the important interests at stake when a party seeks summary judgment, [a] motion court must carefully evaluate the record in light of the governing law, and determine the facts in the light most favorable to the non-moving party." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (emphasis added) (citing R. 4:46-2(c)). In our review of a summary-judgment order we can determine if the court correctly analyzed the parties' Rule 4:46-2 statements, found the undisputed facts, and made the appropriate legal conclusions only if the court makes the required findings of fact, and correlates them to the applicable law, in the first instance. See Great Atl. & Pac. Tea Co., Inc. v. Checchio, 335 N.J. Super. 495, 498 (App. Div. 2000) (explaining a court reviewing a summary-judgment order must measure the trial court's "factual findings" correlated to its legal conclusions "against the standards set forth in"

Brill, 142 N.J. at 540). Indeed, "[t]he obligation to make specific findings on summary judgment motions in accordance with [Rule] 1:7-4 has been explicitly stated in [Rule] 4:46-2 since 1972." Ibid.; R. 1:7-4(a) (requiring a court, "by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon").

Defendant moved for summary judgment on plaintiff's CEPA claim. "CEPA is designed to protect employees who blow the whistle on illegal or unethical activity committed by their employers or co-employees." Est. of Roach v. TRW, Inc., 164 N.J. 598, 609-10 (2000). Thus, a CEPA claim may properly "rest on allegations about the activities of . . . co-employee[s]." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 557 (2013).

CEPA was enacted "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Sauter v. Colts Neck Volunteer Fire Co. No. 2, 451 N.J. Super. 581, 588 (App. Div. 2017) (quoting Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179 (1998)). "The statute 'seeks to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers.'" Ibid. (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138

N.J. 405, 418 (1994)). The statute "prohibit[s] an employer from taking retaliatory action . . . against an employee who discloses, threatens to disclose, or refuses to participate in an activity of the employer 'that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law.'" Id. at 587 (quoting N.J.S.A. 34:19-3).

In pertinent part, N.J.S.A. 34:19-3 provides:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> . . . .
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity . . . ;
>
> (2) is fraudulent or criminal . . . ; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
>
> [N.J.S.A. 34:19-3(c).]

A-0605-22

To establish a prima facie CEPA cause of action under N.J.S.A. 34:19-3(c), a plaintiff must demonstrate:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Chiofalo v. State, 238 N.J. 527, 541 (2019) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)).]

A plaintiff is not required to "show that his or her employer or another employee actually violated the law or a clear mandate of public policy." Allen v. Cape May Cnty., 246 N.J. 275, 290 (2021) (quoting Dzwonar, 177 N.J. at 462). A plaintiff must only "show that he or she '"reasonably believes" that to be the case.'" Ibid. (quoting Dzwonar, 177 N.J. at 462).

Where a plaintiff presents sufficient evidence establishing a prima facie CEPA claim under N.J.S.A. 34:19-3(c), "the burden of persuasion is shifted to the employer to rebut the presumption of [unlawful retaliation] by articulating some legitimate non[-retaliatory] reason for the adverse employment action." Id. at 290-91 (quoting Kolb v. Burns, 320 N.J. Super. 467, 478 (App. Div.

A-0605-22

1999)).  If the employer satisfies that burden, plaintiff bears "the ultimate burden of proving that the employer's proffered reasons were a pretext for the [retaliatory] action taken by the employer."  Id. at 291 (quoting Kolb, 320 N.J. Super. at 478).

The court granted defendant's summary-judgment motion based on its determination that plaintiff lacked sufficient evidence establishing two elements of a prima facie CEPA claim.  The court found plaintiff failed to present evidence plaintiff had engaged in whistleblowing activity as defined in N.J.S.A. 34:19-3(c) and that defendant's decision to promote Sergeant Holloway instead of him to lieutenant was causally related to the purported whistleblowing activity.

The court did not find plaintiff had failed to present sufficient evidence establishing he had satisfied the other elements of a prima facie CEPA claim under N.J.S.A. 34:19-3(c).  That is, the court did not find plaintiff lacked sufficient evidence that he reasonably believed defendant's and his co-employee's actions violated or would violate either a law, rule, or regulation, were criminal, or violated a clear mandate of public policy or that he had not suffered an adverse employment action.  See Chiofalo, 238 N.J. at 541; N.J.S.A. 34:19-1(c)(1), (2), and (3).

Plaintiff does not argue that the court erred by failing to address and rule in his favor on those issues. We therefore do not address them, see Drinker Biddle & Reath LLP v. N.J. Dep't of L. & Pub. Safety, Div. of Law, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011) (explaining an issue not briefed on appeal is deemed abandoned), and we limit our discussion to whether the court correctly determined plaintiff lacked sufficient evidence he engaged in whistleblowing activity as defined in N.J.S.A. 34:19-3(c) and there was a causal connection between the purported whistleblowing activity and defendant's decision not to promote him.

Plaintiff asserted before the motion court and argues on appeal that he engaged in three different instances of whistleblowing activity.[15] First, he claims he engaged in whistleblowing activity when he insisted that Kasko be arrested for aggravated assault on a police officer, Frangieh, after Frangieh reported he had been struck by Kasko's vehicle as Kasko disregarded his orders to stop the vehicle and drove onto the driveway. Plaintiff argues he was adamant

---

[15] Plaintiff's complaint also alleged defendant violated CEPA by "failing to provide compensation due to [him] under the collective bargaining agreement" upon his retirement from the police department. Plaintiff does not argue on appeal that the court erred by granting defendant summary judgment on that claim. We therefore deem abandoned any contention the court erred in granting summary judgment on the claim. Drinker Biddle & Reath LLP, 421 N.J. Super. at 496 n.5.

from the start that Kasko should be arrested, he made that known to Lieutenant Camiscioli and Corporal Ortiz, and they resisted his recommendation as they allegedly attempted to conjure up a reason not to arrest Kasko because he was a Borough Commissioner. Plaintiff alleges he objected and refused to participate in the lieutenant and corporal's efforts to avoid arresting Kasko because those efforts constituted an attempt to commit the criminal offense of official misconduct under N.J.S.A. 2C:30-2.

Plaintiff next claims he engaged in whistleblowing activity by opposing Corporal Ortiz's efforts to ensure that Kasko was formally charged on a complaint-summons instead of a complaint-warrant so Kasko would not be remanded to the county jail on the charges. Plaintiff argues he objected to Corporal Ortiz's efforts by speaking with the court administrator and by speaking directly to the Chief about Corporal Ortiz's efforts. And plaintiff claims he reasonably believed Corporal Ortiz's efforts violated the Criminal Justice Reform Act, N.J.S.A. 2A:162-15 to -26, which, according to plaintiff, requires that an individual charged with aggravated assault on a police officer must be processed through a complaint-warrant and remanded to the county jail to await a release recommendation from Pretrial Services.

Last, plaintiff alleges he engaged in whistleblowing activity by objecting to Corporal Ortiz's initial efforts to avoid submission of the NJRT-1 report and later submission of an incomplete report that plaintiff asserted he reasonably believed was false as a result of its omission of pertinent information. Plaintiff claims he engaged in whistleblowing activity by objecting to and refusing to participate in what he claims he reasonably believed were Corporal Ortiz's efforts not to provide a complete and accurate report and otherwise to provide a false report.

In its assessment of plaintiff's claims and evidence, the motion court applied the wrong standard under CEPA. The court analyzed the viability of plaintiff's claims based on whether plaintiff had "reported to somebody what he believed to be illegal or unethical workplace conduct." But that standard applies to a claim asserted under N.J.S.A. 34:19-3(a), and before the motion court plaintiff asserted his CEPA claims under N.J.S.A. 34:19-3(c), arguing that he had engaged in whistleblowing activity by objecting to and refusing to participate in activities he claimed he reasonably believed violated the law, were criminal, or violated a clear mandate of public policy.[16] See Allen, 246 N.J. at

---

[16] N.J.S.A. 34:19-3(a) provides in pertinent part that

291-92 (explaining differences between proofs required to establish causes of action under subsections (a) and (c) of N.J.S.A. 34:19-3).

The court therefore failed to assess the evidence presented and facts proffered in the parties' Rule 4:46-2 statements in the context of the applicable CEPA provision on which plaintiff based his claims. Moreover, although it generally referred to some of the facts supporting plaintiff's allegations, the court did not make findings as to the undisputed facts based on an analysis of the parties' extensive Rule 4:46-2 statements. Concomitantly, the court could not and did not fulfill the requirement that it correlate the undisputed facts supported by the parties' Rule 4:46-2 statements to the applicable law in rendering its determination plaintiff had not engaged in whistleblowing activity under N.J.S.A. 34:19-3(c). See Checchio, 335 N.J. Super. at 498. Indeed, the

[a]n employer shall not take any retaliatory action against an employee because the employee . . . [d]iscloses or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes: (1) is a violation of a law, or a rule or regulation promulgated pursuant to law . . .; or (2) is fraudulent or criminal . . . .

court never considered whether plaintiff engaged in whistleblowing activity under N.J.S.A. 34:19-3(c)(1), (2), and (3). [17]

The court similarly failed to make findings of the undisputed facts based on the parties' Rule 4:46-2 statements pertinent to its determination that plaintiff failed to establish a causal connection between the purported whistleblowing activity and defendant's decision not to promote plaintiff to lieutenant. Instead, the court's analysis of that issue is limited to its conclusory determinations—none of which is tethered to any findings of fact based on an analysis of the parties' Rule 4:46-2 statements—that even if plaintiff "had been given a higher score, at best it puts him in the running to be considered but it doesn't guarantee appointment as lieutenant," and Sergeant Holloway was otherwise qualified for the position and had more seniority.

---

[17] In his reply brief, plaintiff asserts for the first time that the court erred by failing to find he had engaged in whistleblowing activity under N.J.S.A. 34:19-3(a)(1) and (2) by disclosing to his superiors—Lieutenant Camiscioli and Chief Cutler—that Corporal Ortiz had requested the court clerk change Kasko on a complaint-summons and then separately refused to complete the NJTR-1 report and submitted an incomplete and thereby false report. We do not consider the argument. It is not properly before us because it is raised for the first time in plaintiff's reply brief. Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 543 (App. Div. 2009); N.J. Citizens Underwriting Reciprocal Exch. v. Kieran Collins, D.C., LLC, 399 N.J. Super. 40, 50 (App. Div. 2008).

A-0605-22

The court's analysis does not account for or address the numerous factual assertions included in plaintiff's Rule 4:46-2 statement pertaining to the promotion decision, including his claims: his command staff review scores had been reduced without any proper basis from scores he had previously received on comparable performance evaluations; he had otherwise been the candidate with the highest score based on the interview portion of the evaluation process that had been conducted by an association that was unaffiliated with the police department; and the Score Sheet Lieutenant Camiscioli had prepared inaccurately included a higher score for Sergeant Mueller's command staff review than she had actually earned and, as a result, plaintiff had been ousted from the top three in the scoring, was deemed ineligible for any consideration for the promotion, and was not considered at all for the position.[18]

Of course, in assessing whether there was a causal connection between the alleged whistleblowing activity and an adverse employment action, a fact finder

[18] By pointing out these purported facts that are included in the parties' Rule 4:46-2 statements, we do not offer an opinion on the sufficiency of plaintiff's proofs or suggest any particular result in the motion court's assessment of the issues presented. Nor do we suggest there are no other facts set forth in the Rule 4:46-2 statements pertinent to a determination of plaintiff's claim and defendant's opposition. We cite to those asserted facts to demonstrate that the court did not correctly make findings of facts based on the parties' Rule 4:46-2 statements and therefore could not and did not correlate those facts under the applicable legal standard in reaching its determination.

42

may consider "the surrounding circumstances" and may infer from the evidence that an adverse employment decision was based on a "'tainted' evaluation" performed by an employee in retaliation for the plaintiff's whistleblowing activity. Est. of Roach, 164 N.J. at 611. The court's lack of any fact-finding based on an analysis of the parties' Rule 4:46-2 statements rendered it impossible for the court to properly consider all the surrounding circumstances pertinent to a proper determination of whether plaintiff presented sufficient evidence establishing a causal connection between his purported whistleblowing activity, his exclusion from the list of candidates eligible for the promotion, and defendant's decision not to promote him.

We have observed that "neither the parties nor [a reviewing court] are well-served by an opinion devoid of analysis." Checchio, 335 N.J. Super. at 498. "Failure to make explicit findings and clear statements of reasoning '"constitutes a disservice to the litigants, the attorneys and the appellate court."'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Curtis v. Finneran, 83 N.J. 563, 569-70 (1980)). And it is impossible to determine if the court correctly satisfied its obligation to determine the facts "in the light most favorable to the party opposing the motion" in the absence of any analysis of the parties' Rule 4:46-2 statements, reasoned findings as to the undisputed material facts based

on the analysis, and a correlation of the findings of fact to the applicable legal principles. Checchio, 335 N.J. Super. at 498, 502.

Although we conduct a de novo review of a summary-judgment order applying the same standard as the trial court, Conforti v. Cnty. of Ocean, 255 N.J. 142, 162 (2023), "our function as an appellate court is to review the decision of the trial court, not to decide the motion tabula rasa," Est. of Doerfler v. Fed. Ins. Co., 454 N.J. Super. 298, 301-02 (App. Div. 2018). It is appropriate to decline to exercise original jurisdiction where disposition of the issues presented by defendant's summary-judgment motion is necessarily dependent on proper findings of the undisputed facts based on a careful analysis of the parties' Rule 4:46-2 statements, and the motion court has not conducted that analysis and made those findings in the first instance. See ibid.; see also Price v. Himeji, LLC, 214 N.J. 263, 294 (2013) (explaining Rule 2:10-5 "allow[s an] appellate court to exercise original jurisdiction to eliminate unnecessary further litigation, but discourage[s] its use if factfinding is involved") (alterations in original) (quoting State v. Santos, 210 N.J. 129, 142 (2012)).

In the absence of adequate findings by the court based on the parties' Rule 4:46-2 statements and because the court applied the incorrect legal standard to assess plaintiff's proofs as to his alleged whistleblowing activity, we vacate the

44

summary-judgment order and remand for reconsideration of the motion anew. Est. of Doerfler, 454 N.J. Super. at 302. The court shall permit re-argument by the parties, permit the filing of additional submissions, and conduct such proceedings as may be appropriate based on the arguments presented. The remand court shall conduct the requisite analysis of the parties' Rule 4:46-2 statements, the competent evidence presented, and the applicable legal principles, and make findings of fact and conclusions of law based on its analysis of the parties' Rule 4:46-2 statements and as otherwise required under Rule 1:7-4. See Checchio, 335 N.J. Super. at 498 (explaining a court deciding a summary-judgment motion "is obliged to set forth factual findings and correlate them to legal conclusions").

Vacated and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0605-22