FISHER, P.J.A.D.
*326 In this second appeal of a group of convoluted and consolidated foreclosure actions, we review the findings and conclusions drawn by the experienced chancery judge from the proofs elicited at an evidentiary hearing required by our earlier remand. Brunswick Bank & Tr. v. Affiliated Bldg. Corp., 440 N.J. Super. 118, 111 A.3d 710 (App. Div. 2015). We certainly did not burden the chancery judge with the easiest of tasks, and defendants' presentation of *327 evidence certainly gave voice to the song lyric, "when nothing makes any sense, you have a reason to cry."[1] But, *1032 after careful review, we cannot endorse the judge's finding that defendants failed to present "competent" evidence to support the remedy they seek. Consequently, we are constrained to again remand.
The consolidated cases concern five construction and development loans, four of which were made to defendant Heln Management, LLC, and the fifth to Affiliated Building Corp.; Jeffrey Miller, a principal of both entities, and his daughter Melanie Miller, were joined as defendants because they guaranteed repayment. Repayment was also ensured by mortgages held by Brunswick Bank on properties owned by Heln and Affiliated. We provided greater detail about these transactions in our earlier opinion, id. at 120 n.2, 111 A.3d 710, and will attempt not to unduly repeat what was then said.
In deciding the earlier consolidated appeals, we ultimately remanded because issues concerning whether Brunswick Bank collected more than one-hundred percent of defendants' collective debt on all the loans could not be resolved "without a full accounting of the cash and property collected by plaintiff applied against the amount of the Law Division judgment and the interest that accrued on that judgment, as well as expenditures in 'different categories of [permissible] damages' not adjudicated in the Law Division action." Id. at 128, 111 A.3d 710 (alteration in original; quoting First Union Nat'l Bank v. Penn Salem Marina Inc., 190 N.J. 342, 345, 921 A.2d 417 (2007) ). The judgment referred to was the product of Brunswick Bank's 2010 complaint in the Law Division seeking a money judgment on four of the five loans; Brunswick Bank chose that option rather than pursuing foreclosure on the mortgage properties. Default judgment was entered on August 18, 2010, against Heln for $1,884,141.84, and against Affiliated for $175,000; both guarantor-defendants were declared jointly and severally liable on both those obligations.
*328 Id. at 120-21, 111 A.3d 710. By taking that course, Brunswick Bank opted to allow the unpaid debt on the four defaulted loans alleged in the Law Division complaint to accrue interest at the rate provided by Rule 4:42-11(a), rather than the interest rate to which the parties had been contractually bound. Brunswick Bank, 440 N.J. Super. at 127, 111 A.3d 710.
After filing the Law Division action, Brunswick Bank filed four separate foreclosure actions. Three were filed in 2010, shortly before Brunswick Bank obtained the Law Division judgment: two in Middlesex County and a third in Monmouth County. A fourth was filed in Middlesex County in 2013. Default judgments setting redemption amounts were entered in 2012 and 2013. There followed-as we previously described in greater detail, id. at 121-22, 111 A.3d 710 -sales of properties encumbered by mortgages; this provided rolling compensation for Brunswick Bank against all defendants' obligations.
In his earlier decision, the chancery judge recognized the loans might have been "over-collateralized" and questions about whether Brunswick Bank had been fully compensated on the entire obligation were presented. The judge concluded, however, that the record was "too muddled," and he acknowledged his power to "prevent a windfall" had to await "a full and complete factual record." Id. at 122, 111 A.3d 710.
In resolving the prior consolidated appeals, we drew the same conclusion about the lack of clarity or certainty about the amount of compensation obtained by Brunswick Bank, and we remanded for illumination. We emphasized a court's power to prevent a windfall and to ensure a judgment creditor recovers no more than the amount of the debt by applying the fair market value credit of property struck off *1033 at a sheriff sale. Id. at 125, 111 A.3d 710 ; see also MMU of N.Y.,Inc. v. Grieser, 415 N.J. Super. 37, 40, 999 A.2d 1204 (App. Div. 2010). We also recognized that the proceedings would be most efficiently handled by a single judge; we, thus, designated the Middlesex chancery judge to provide a "global resolution" of the pending issues. Id. at 128, 111 A.3d 710. *329 The question before us now is whether, following our remand, the factual clarity we sought was actually achieved. Following our remand, the chancery judge conducted as thorough an evidentiary hearing, over the course of four days, as the parties' presentations permitted and rendered written findings. After identifying and quantifying the various debts, property sales, and collection efforts, the judge concluded Brunswick Bank was entitled to "$2,670,825.92 plus additional interest not calculated, attorney's fees and costs, such as real estate taxes paid, not included in the [Law Division judgment]."[2] The judge was not precise about the total dollar amount due when adding those other items; he simply concluded Brunswick Bank was owed
at least $2.7 million dollars [and] ... has received $2,599,208.51. [Brunswick Bank] also, as a result of two [s]heriff's [s]ales, owns Beacon Hill and Baldwin. Defendants failed to introduce any competent evidence to establish the fair market value of these properties at the time of the [s]heriff's [s]ale.
Consequently, the judge "discharged" the Law Division judgment and, because Brunswick Bank so "stipulated," the judge restrained-we assume permanently-Brunswick Bank from "pursuing any deficiency judgment" against defendants. The judge entered orders memorializing those determinations in October and December 2015.
In appealing, defendants argue that: (1) Brunswick Bank's many claims "merged into" the Law Division judgment and created "one debt to be collected and satisfied"; (2) the successive foreclosure complaints constituted "de facto deficiency actions" and allowed defendants to challenge them as deficiency actions; (3) the judge erred in failing to provide them with the benefit of a fair market value credit for the properties ultimately received by Brunswick Bank through the foreclosure actions; and (4) "a deficiency action *330 is illusory where a mortgagee has first brought an action on its note prior to foreclosing its mortgage." In a fifth point, defendants explain they "are not seeking damages, but only a credit against the amount due and the voiding of the sheriff's sales, the return of title and the enforcement of settlement on Loren Terrace."
We start by recognizing, as previously held, that Brunswick Bank was entitled to collect only what was collectively owed from these defendants. Although the loans were separately made, Brunswick Bank recognized the link among all the loans by, among other things, commencing a single Law Division suit on four of the loans, apparently leaving out the fifth only through oversight.[3] Although our earlier opinion could have been clearer, our mandate directed that all the loans and *1034 payments against all the loans be accounted for in a single proceeding so that Brunswick Bank would not, as a result of the sequential manner in which collection was sought or occurred, come away from these proceedings with a windfall. It cannot be over-emphasized that the very nature of a foreclosure action suggests the potential for a forfeiture, and that-because "equity abhors a forfeiture," Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 100 N.J. 166, 182, 495 A.2d 66 (1985) -a court of equity may in appropriate circumstances, through application of fair market value credits, or by other recognized means, spare a party from an unwarranted forfeiture.[4] Foreclosure, as we have observed, is a discretionary remedy. Sovereign Bank, FSB v. Kuelzow, 297 N.J. Super. 187, 196, 687 A.2d 1039 (App. Div. 1997). Because the pursuit of that remedy summons the court's equity jurisdiction, the court may, *331 through the imposition of flexible remedies, adjust the parties' rights, with regard to the facts, to achieve a fair and just result. See Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403, 411-12, 1 A.2d 425 (E. & A. 1938) (citation omitted) (recognizing that "[e]quitable remedies are distinguished for their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use"); see also US Bank Nat. Ass'n v. Guillaume, 209 N.J. 449, 476, 38 A.3d 570 (2012) ; Matejek v. Watson, 449 N.J. Super. 179, 183, 155 A.3d 1049 (App. Div. 2017) ; Marioni v. Roxy Garments Delivery Co., 417 N.J. Super. 269, 275, 9 A.3d 607 (App. Div. 2010). By seeking foreclosure, Brunswick Bank "exposed itself to the operation of equitable principles and must submit to an equitable resolution." Totowa Sav. & Loan Ass'n v. Crescione, 144 N.J. Super. 347, 352, 365 A.2d 713 (App. Div. 1976). Ascertaining the fair market values of property acquired by Brunswick Bank is one way in which a court of equity may determine whether it has been overcompensated.
Although understated in our earlier opinion, our direction that the chancery judge conduct an evidentiary hearing to ascertain what was collectively owed and what was collectively received on these loans was intended to ensure that through the many complications in the prior trial court proceedings Brunswick Bank had not been overcompensated. The judge's findings as to the amount owed to Brunswick Bank ("at least" $2,700,000[5] ) and the money received by Brunswick Bank in compensation ($2,599,208.51)-findings supported by the evidence and entitled to our deference, Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974) -demonstrate that Brunswick Bank acquired in cash nearly the entirety of the amount owed; according to those findings, Brunswick Bank recovered ninety-six percent of the overall debt. So, we proceed with an understanding that at a *332 certain period of time-and this presents a gray area to explore on remand, as we will soon explain-Brunswick Bank had received in cash from defendants all but $100,791.49. But, as the chancery judge recognized, Brunswick Bank also came away with the *1035 properties known as Baldwin and Beacon Hill.
The evidence about the collection efforts as Brunswick Bank neared receipt of a one-hundred percent recovery revealed that sheriff sales on Baldwin and Beacon Hill occurred on June 17, 2013, and December 30, 2013, respectively.[6] In January 2014, after those sales occurred, Brunswick Bank also obtained $147,387.37 from a settlement regarding property known as Loren Terrace.[7] Simple but admittedly inexact math suggests Brunswick Bank was only owed approximately $250,000[8] when the first of these last three collection events occurred on June 17, 2013. These general circumstances alone suggest a likelihood that Brunswick Bank gathered through its collection efforts more than that to which it was entitled. The chancery judge denied relief and did not make the findings necessary to make that determination but only because he found defendants' evidence "incompetent." Because we disagree with that conclusion and because the judge's findings do *333 not permit a clearer understanding as to whether Brunswick Bank received a windfall, we remand again.
To be exact as to what must follow today's decision, we direct that the judge first determine whether Baldwin had a fair market value greater than the approximate $250,000 shortfall. If so, then Brunswick Bank, by becoming Baldwin's owner, would have been fully compensated and no further right in equity would have existed to proceed against any other mortgaged property or any other assets of defendants. The precise amount above the rounded shortfall of $250,000-that is, if Baldwin's fair market value was greater-would be irrelevant since that is the type of windfall law and equity would allow Brunswick Bank to reap.[9]
If, however, Baldwin did not possess a fair market value in excess of $250,000, then Brunswick Bank was entitled to further pursue its collection efforts and to force a sheriff sale of Beacon Hill. If the judge's future findings are in accord with this possibility, the judge must ascertain what thereafter remained due to Brunswick Bank and, once ascertained, whether the fair market value of Beacon Hill exceeded what remained of the $250,000 shortfall. If Beacon Hill's fair market value *1036 [10] did not swallow that remaining shortfall, then the judge could find Brunswick Bank entitled to pursue the Loren Terrace proceeds but only to the extent of the remaining shortfall once the fair market values of both Baldwin and Beacon Hill have been applied against the shortfall existing on June 17, 2013. If, however, the shortfall was *334 extinguished by Brunswick Bank's receipt of the fair market value of both Baldwin and Beacon Hill, Brunswick Bank would have no right to any part of the Loren Terrace funds ($147,387.37) obtained in January 2014.
If we could answer these questions by resort to the existing factual findings, we would spare the parties further expense and trouble and simply exert original jurisdiction to bring down the curtain on this matter. See R. 2:10-5; Price v. Himeji, LLC, 214 N.J. 263, 294, 69 A.3d 575 (2013) ; Vas v. Roberts, 418 N.J. Super. 509, 523, 14 A.3d 766 (App. Div. 2011). We unfortunately cannot take that step because of the remaining questions we have outlined. The devil will be in the details but efforts to obtain a clear understanding of what transpired at the pivotal times so far has proven devilishly difficult. We, thus, return this matter to the trial court.
The precise values of the properties, to be sure, have not been conclusively established. In considering the parties' contentions, the chancery judge concluded that defendants "failed to introduce any competent evidence to establish the fair market value[s] of [Beacon Hill and Baldwin] at the time of the [s]heriff's [s]ale[s]." The judge gave little further inkling and left us with no explanation why he found the evidence on that subject to be "incompetent." Indeed, it is not entirely clear what the judge meant when describing the evidence as "incompetent." Three possibilities come to mind; the judge could have meant: (1) that the evidence was not persuasive; (2) that the evidence on that subject was inadmissible; or (3) that the evidence did not come from a competent source.
As to the first, had the judge held the evidence failed to persuade, our standard of review would require some deference. Rova Farms, 65 N.J. at 483-84, 323 A.2d 495. In considering the second possibility-that the evidence offered on that subject was inadmissible-we would look to determine whether that ruling constituted an abuse of discretion. This standard provides some leeway, but a judge's exercise of discretion is never unbridled. See *335 In re Commitment of M.M., 384 N.J. Super. 313, 332, 894 A.2d 1158 (App. Div. 2006). In this context, a valid exercise of discretion presupposes a reasoned application of the rules of evidence, and the judge here did not allude to a particular rule to guide us in understanding why he might have viewed the evidence inadmissible-assuming that's what he meant by "incompetent." And it is not at all clear whether the judge's unexplained determination that defendants' evidence was "incompetent" was meant to convey that the source of the evidence was an unreliable vehicle for conveying those facts; in short, that defendants had not called an expert.[11]
In the final analysis, we are unable to defer to the judge's conclusory determination about the "competency" of defendants' evidence. It may be-as the proponent of a credit-defendants were rightly *1037 saddled with the burden of introducing evidence on the fair market value of Baldwin and Beacon Hill.[12] Even so, the *336 judge received competent evidence that shed light on Baldwin's fair market value. He heard, for example, from defendant Jeffrey Miller that a third party had contracted to buy Baldwin in 2012 for $335,000; that transaction, he testified, would have closed but for Brunswick Bank's refusal to release its lien for whatever it would have recouped from the transaction. This testimony was "competent" within the meaning of the rules of evidence[13] and the source of that evidence asserted he possessed personal knowledge.[14] Nowhere in his findings did the judge conclude Miller was not a credible witness. And the judge never said whether or not he found Miller truthful in this regard. The judge also heard testimony from Brunswick Bank's representative that, after its acquisition, Brunswick Bank listed Baldwin for sale for $349,900[15] ; that testimony, if true, would appear to corroborate Miller's testimony *337 and provide some insight into Baldwin's value. To be sure, none of this is necessarily conclusive about the property's fair market value, but the presence of this evidence belies the *1038 judge's sole conclusion for declining to make a finding on fair market value: the lack of "competent" evidence. If we interpret that conclusion as being based on the absence of expert testimony, the judge was correct; defendants presented no expert testimony. And, to be sure, it would have behooved defendants to present an expert to give an opinion on the fair market value of these properties. But fair market value may be demonstrated by other types of evidence, including the existence of an arms-length agreement to purchase the same property at or about the same time of the inquiry: what a willing buyer would pay a willing seller, neither acting under a compulsion. See State v. Silver, 92 N.J. 507, 513, 457 A.2d 463 (1983) ; New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 543, 189 A.2d 702 (1963). Although we are appreciative of the judge's considerable attempts to wring from defendants the evidence the judge viewed relevant over the course of a most tortuous evidentiary hearing,[16] the judge was certainly empowered in these circumstances to appoint his own expert as a means of clarifying, as well as expediting, a disposition of the issues.[17]
In light of these observations, we find it necessary to remand the matter for additional findings. The judge should engage in the sequential analysis of the last three collection events as we explained in greater detail earlier in this opinion.[18]
*338 We can offer no other guidance for the daunting task that awaits the trial court. We leave it to the judge's discretion whether the record should be expanded in order to achieve a fair and just result, which may prove difficult, but not insurmountable. See Graf v. Hope Bldg. Corp., 254 N.Y. 1, 171 N.E. 884, 888 (1930) (where Chief Judge Cardozo observed in dissent that "equity will find a way, though many a formula of inaction may seem to bar the path").
The orders under review are vacated and the matter remanded for further findings and determinations in conformity with the letter and spirit of this opinion. We do not retain jurisdiction.

Lucinda Williams, Reason To Cry (2001).

According to the judge's September 28, 2015 decision, the $2,670,825.92 figure was ascertained by taking the original amount of the Law Division judgment-$2,059,141.84-and adding accrued interest, as well as a $327,345.40 loan and a $200,000 loan, neither part of the Law Division action, plus real estate taxes incurred by Brunswick Bank, and interest on those other loans as well.

We assume from counsel's representations early in the hearing's first day that Brunswick Bank did not intentionally leave one of the loans out of the Law Division matter.

Consequently, we reject Brunswick Bank's argument that a fair market value credit has relevance only when a judgment creditor pursues a deficiency judgment against a judgment debtor. N.J.S.A. 2A:50-3 expressly recognizes the application of a fair market value credit in that circumstance, but that statute does not exclusively limit its application to only that circumstance.

Brunswick Bank does not quarrel with-and has not cross-appealed from-the judge's failure to more precisely ascertain the amount due beyond a finding that the debt was "at least $2.7 million dollars." We, thus, proceed on an assumption that Brunswick Bank was owed at that time only $2,700,000.

The record does not disclose what Brunswick Bank bid when obtaining either of these properties.

Brunswick Bank's foreclosure action regarding Loren Terrace was filed on June 19, 2013-two days after the sheriff sale of Baldwin on June 17, 2013-and resulted, on January 17, 2014, in a mutual agreement that Brunswick Bank would receive $147,387.37 of the proceeds of defendants' sale of Loren Terrace to a third person. This circumstance is referred to in our earlier opinion. Brunswick Bank, 440 N.J. Super. at 123-24, 111 A.3d 710.

It is important to know what Brunswick Bank was owed and what it had been paid as of June 17, 2013. Resort to the chancery judge's findings does not permit a precise assessment of that amount. Instead, we have only backed out the $147,387.37 that Brunswick Bank didn't receive until seven months after the June 17, 2013 sheriff sale, leaving the sum of all amounts collected before June 17, 2013, at $2,451,821.14. Subtracting that amount from the overall $2,700,000 provides an approximate $250,000 difference.

Defendants conceded this in the trial court, as demonstrated by the following colloquy:
THE COURT: Can we agree that as a result of the bank receiving instead of someone bidding at the sheriff sale and satisfying the judgment and that third party getting the property, that as a result of the bank getting the property that if Baldwin ... had a value of $350,000 at the time of the sheriff sale and the bank was only owed $100,000, that your client is not entitled to receive the money [i.e., difference] from the bank?
[DEFENSE COUNSEL]: Yes, Your Honor.

Beacon Hill was purchased by Heln in 2008 for $289,900, a sum borrowed from Brunswick Bank for that purpose.

This last possibility is likely what the judge meant since earlier in his opinion he described what had been presented at the hearing by stating that "[n]o expert testimony has been offered ... as to the value of these properties at the time of the [s]heriff's [s]ale[s]."

When asked to craft an equitable remedy or when asked to bar equitable relief based on the assertion of an equitable defense, a court of equity must be careful not to allow the ultimate disposition to turn on a rigid allocation of the burden of persuasion, as may have occurred here when the judge withheld relief because he viewed defendants' evidence as incompetent. The issuance of an equitable remedy when pitted against an asserted equitable defense calls for a court's exercise of equitable discretion according to the circumstances of each particular case. See generally Pomeroy, Specific Performance § 46 (3d ed. 1926). Consequently, it is not often helpful to grant or deny relief purely on the assignment of the ultimate burden of persuasion on an issue. For example, if we are to consider a litigant's "burdens" in a chancery case, we might start with a defendant who has urged laches, which has been defined as "a defense when there is delay, unexplained and inexcusable, in enforcing a known right, and prejudice has resulted to the other party because of that delay." Gladden v. Pub. Emp. Ret. Sys. Tr. Bd., 171 N.J. Super. 363, 370-71, 409 A.2d 294 (App. Div. 1979). That defendant has the burden of pleading that defense. R. 4:5-4. But, as the matter progresses beyond the pleading stage, each party may be expected to introduce evidence to support some aspect of that defense or a response to it. That is, defendant may be expected to show a particularly lengthy passage of time, the plaintiff may then be called upon to explain or provide an excuse for that delay or whether the right now asserted was known, or when it became known, and the defendant may then be expected to offer evidence to show prejudice has resulted from the delay. Consequently, to generalize about which party has the burden of proving or disproving the defense of laches-upon pain of a rejection of its position-becomes an unnecessary distraction to the exercise of equitable jurisdiction. The court must consider all the evidence offered in determining the presence of all aspects of the defense.

Certainly, none of the recognized circumstances for finding a witness incompetent to provide evidence in general or on a particular subject was remotely suggested. N.J.R.E. 601.

During the judge's own questioning about the aborted Baldwin transaction, he seemed to recognize that the witness had "personal knowledge" of the relevant facts:
THE COURT: ... So somebody wants to buy Baldwin for $335,000 you were apparently willing to sell it for $335,000. So what happened after this contract was entered into back in 2012?
....
THE COURT: ... Mr. Miller you're the only one that has personal knowledge of this. So ... you had somebody who was willing to buy Baldwin, okay, they offered 335. You were willing to accept 335. What happened? We know that this deal didn't close. What happened?
THE WITNESS: It was my understanding the bank wouldn't release the property.
[Emphasis added.]

Beacon Hill was listed for sale at the same price.

With some good cause, the judge invoked during the course of the hearing-in an attempt to steer defendants toward those things the judge deemed relevant-the old adage: "garbage in, garbage out."

Indeed, today's decision should not be interpreted as leaving the next judge-we are mindful the chancery judge has since retired-with the burden of resolving the matter based on the existing record. The judge is free to expand the record to whatever extent deemed necessary to reach a fair and equitable resolution of these remaining disputes. And nothing we have said today would preclude the judge from requiring a party or the parties, to whatever extent the judge deems appropriate, to retain an independent expert of the judge's choosing to opine on the fair market value of these properties.

The judge will also need to consider other costs that may have been incurred by Brunswick Bank in the interim and whether they should be added to defendants' obligation or in good conscience borne by Brunswick Bank if it obtained greater compensation than that to which it was entitled. We are mindful that the evidentiary hearing occurred in August 2015 and the matter decided by the chancery judge in September 2015. Costs and expenses regarding the properties in question have undoubtedly accrued since. Indeed, it may be that one or both properties have been sold in the interim.