**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1794-22

JZS MADISON, LLC and
MADISON AVENUE
AND 74TH STREET
INVESTMENT, LP,

       Plaintiffs-Appellants/
       Cross-Respondents,

v.

D3N7, LLC and DAVID
NEVELOFF,

       Defendants-Respondents/
       Cross-Appellants.

_____

DAVID NEVELOFF and
D3N7, LLC,

       Plaintiffs-Respondents/
       Cross-Appellants,

v.

DANIEL E. STRAUS and
JZS MADISON, LLC,

       Defendants-Appellants/

Cross-Respondents.

_____

Argued February 10, 2025 – Decided November 10, 2025

Before Judges Gummer, Berdote Byrne and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket Nos. L-7906-18 and L-4621-18.

Thomas P. Scrivo and Young Yu argued the cause for appellants/cross-respondents (O'Toole Scrivo, LLC, Daniel R. Benson (Kasowitz Benson Torres LLP) of the New York bar, admitted pro hac vice, and Thomas Kelly (Kasowitz Benson Torres LLP) of the New York bar, admitted pro hac vice, attorneys; Thomas P. Scrivo, James DiGiulio, Young Yu, Daniel R. Benson and Thomas Kelly, of counsel and on the briefs).

Kevin H. Marino and John A. Boyle argued the cause for respondents/cross-appellants (Marino, Tortorella & Boyle, PC, attorneys; Kevin H. Marino and John A. Boyle, on the briefs).

The opinion of the court was delivered by

GUMMER, J.A.D.

This appeal is about a dispute concerning compensation. JZS Madison, LLC (JZS) and David Neveloff, along with other parties, sued each other and others in subsequently-consolidated lawsuits. At the heart of those lawsuits was whether JZS had fully compensated Neveloff and D3N7, LLC (D3N7), an entity Neveloff owned, in connection with a real-estate development project. The

2

court ultimately concluded Neveloff and D3N7 (collectively the Neveloff parties) were entitled to some additional compensation but not the full amount they sought. We reverse an order granting in part and denying in part the parties' summary-judgment motions because the trial court failed to recognize the ambiguity in the contractual terms at issue and the existence of genuine issues of material fact. We also reverse orders denying reconsideration of that order and awarding prejudgment interest. Perceiving no error or abuse of discretion, we affirm an order the court entered after conducting a bench trial on claims that remained after the improvident grant of summary judgment.

I.

We discern the material facts from the summary-judgment record, viewing the evidence in a light most favorable to the non-moving party. See Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 71 (2024).

Daniel Straus hired Neveloff in 2009. After he was hired, Neveloff looked for real-estate investment and development opportunities. In 2010, Neveloff asked Straus if he would be interested in purchasing and investing in certain properties (the Property) located in New York City. The Property consisted of eight buildings: six brownstones, one small townhouse, and one large townhouse. In August 2010, Straus formed JZS in advance of its anticipated

purchase and acquisition of the Property. When it was formed, the sole equity member of JZS was Madison Avenue and 74th Street Investment, LLC (Madison), an entity owned by Straus and his related trusts.[1] In October 2010, JZS purchased the Property for $95 million.

On July 21, 2011, JZS and Neveloff signed a letter agreement (the Original Agreement). The parties dispute the events, discussions, and negotiations that resulted in the creation and execution of the Original Agreement. In the Original Agreement, the parties described JZS as the owner of the Property and defined the "Project" as:

> [JZS's] current intention . . . to (i) sell the [l]arge [t]ownhouse and (ii) develop the [b]rownstones and the [s]mall [t]ownhouse into a mixed use development (the "Development") consisting of retail space (the "Retail Space") and residential units (the "Residential Units"), which Residential Units may be offered for sale as condominium units (the "Condo Units").

They described Neveloff as its employee and as having "primary responsibility for the management of the Project." Under the letter agreement, JZS and Neveloff agreed that, in addition to his regular salary and "[i]n consideration of the services rendered and to be rendered to [JZS] for management of the

---

[1] According to the Neveloff parties, Madison later became a limited partnership. Madison identified itself as a limited partnership in the lawsuit it later filed with JZS. We refer to Straus, JZS, and Madison collectively as the JZS parties.

4

Project," Neveloff could be entitled to receive two forms of incentive-based compensation:  "Condo Unit Participation Interest" (CUPI) and "Project Participation Interest" (PPI).

Under a heading in the Original Agreement referencing CUPI, JZS agreed in paragraph 1(a) to pay Neveloff a "Condo Participation Amount," which was "equal to five percent (5%) of the Net Condo Proceeds . . . received by [JZS] from the sale of all of the Condo Units."  "Net Condo Proceeds" was defined as:

> the excess, if any, of (i) the aggregate gross cash proceeds received by [JZS] from the sale of all of the Condo Units, net of any and all costs and expenses incurred by [JZS] in connection with such sale . . . over (ii) the sum of (A) [s]ixty [t]wo [m]illion [d]ollars ($62,000,000.00) plus (B) the excess of (x) the sum of any and all costs, expenses, expenditures and amounts, including, without limitation, hard and soft costs, marketing costs, professional fees, consulting fees, real estate taxes and insurance, paid or incurred by [JZS] in connection with the Development, (but excluding all financing costs, including interest, fees, mortgage recording costs and similar financing related expenses), over (y) [t]hirty [m]illion [d]ollars ($30,000,000.00).
>
> [(Emphasis added).]

Paragraph 1(a) also provided that "[t]o the extent any [c]ondo [u]nits are held off market or sold to family members at less than fair market value . . . [JZS] and [Neveloff] will reasonably cooperate with each other to consider appropriate adjustments to the [Condo Participation Amount]."

Under a heading in the Original Agreement referencing PPI, JZS agreed in paragraph 2(a) to pay Neveloff a "'Participation Percentage' . . . equal to the Vested Percentage . . . of each Distribution . . . made by [JZS] to its members." "Distribution" was defined as "any cash distribution made by [JZS] to its members which represents a distribution of (i) [JZS's] Net Income or (ii) proceeds arising from any sale or financing of the Project, excluding distributions which represent a return of capital." Paragraph 2(b) of the Original Agreement further stated that JZS "shall have no obligation to pay any Participation Percentage amount unless, as of the date of the Distribution, each member of [JZS] has previously received, or will receive from such Distribution, in cash, a return of all capital contributions made by such member to [JZS]" and that "[a]ll Distributions shall be deemed first to be a return of capital."

Paragraph 2(e) identified and defined certain "[m]ilestone[s]." "Approvals Milestone" was defined as "the receipt by [JZS] of any and all land use approvals and permits necessary to develop the property . . . ." "CO Milestone" was defined as "the issuance of temporary or permanent certificates of occupancy which permit the immediate occupancy of all of the [c]ondo [u]nits and . . . the [r]etail [s]pace is completed such that the space is ready to be leased to retail users." "Condo Milestone" was defined as when JZS "has sold or leased

6

ninety percent (90%) or more of the [r]esidential [u]nits." "Retail Milestone" was defined as when JZS "leased seventy-five percent (75%) or more of the [r]etail [s]pace to third party retail tenants."

Under paragraph 2(d) of the Original Agreement, "Vested Percentage" meant:

> as of any date of determination, the sum of the following: (i) 0.75% if as of such date, the Approvals Milestone . . . has been achieved; (ii) 0.75% if as of such date the CO Milestone . . . has been achieved; (iii) 1.5% if as of such date, the Condo Milestone . . . had been achieved; and (iv) 2.0% if as of such date the Retail Milestone . . . has been achieved.

Thus, if all the milestones were not met by the "date of determination" for a Distribution, the Vested Percentage for PPI would be the sum of the designated percentages for the milestones that had been met. The Vested Percentage would be five percent if, "as of any date of determination," all of the milestones were met. Paragraph 2(g) of the Original Agreement also provided:

> Notwithstanding the foregoing, the "Vested Percentage" shall be 5% upon any sale by [JZS] of the entire Property . . . or the sale of the retail condominium or the bulk sale of all (or the remaining, as applicable) Condo Units, provided, that as of the date of the closing thereof, or the date of execution of a binding contract of sale therefore, if earlier [Neveloff] is then employed by [JZS] . . . .

7

After executing the Original Agreement, JZS and Neveloff decided to include the large townhouse in the Development. Consequently, they determined they "need[ed] to change the formula by which compensation w[ould] be calculated." They also agreed to move the PPI portion of Neveloff's incentive-based compensation from the Original Agreement to an amended operating agreement for JZS because Neveloff had requested JZS admit him as a non-equity member so he could gain a personal tax advantage in the event of a Distribution. In a September 9, 2013 letter agreement (Amended Agreement), JZS and Neveloff amended the Original Agreement by, among other things, including the large townhouse in the definition of Development and changing the $62 million baseline, which the parties refer to as the "hurdle," in the CUPI formula in paragraph 1(a) to $88,105,263. They deleted certain paragraphs, including 2(a) and (b) concerning PPI, renumbered other paragraphs, and attached as Exhibit A an amended and restated operating agreement of JZS, dated September 9, 2013 (Amended Operating Agreement).

In the Amended Operating Agreement, Madison and D3N7 were listed as the members of JZS and Neveloff was described as D3N7's "sole equity owner." According to Neveloff, he created D3N7 for the purpose of it being a member of JZS, which he believed was "tax advantageous" to him. As set forth in an

attached schedule, Madison had a 100% "[p]ercentage [i]nterest" in JZS and had made a $10,000,000 capital contribution and D3N7 had a 0% "[p]ercentage [i]nterest" and had made no capital contributions. D3N7 had no voting rights, except as to making certain amendments to the operating agreement. Under paragraph 6.1 of the Amended Operating Agreement, Straus, as JZS's manager, had "the full and complete power, authority and discretion for on behalf of and in the name of [JZS], to perform all contracts and other undertakings that it may in his sole discretion deem necessary or advisable to carry out any and all of the objects and purposes of [JZS]" and had "absolute, complete and unqualified discretion" regarding all matters concerning the Project. Paragraph 6.7 provided:

> [JZS] shall be free to make any decision and deal with the Project without regard to the impact upon any Member, except that to the extent any Condo Units are held off the market or sold to Affiliates of the Manager at less than fair market values or the make up of the Project . . . changes after the date hereof, the Manager will cooperate with the Members, including [D3N7], to consider appropriate adjustments, if any, to the terms of this Agreement.

The PPI provisions were moved from the Original Agreement to an "annex" attached to the Amended Operating Agreement and changed to provide payment to D3N7 instead of Neveloff directly.

A-1794-22

Madison made capital contributions to JZS totaling approximately $48,263,500. In 2016, JZS made distributions in separate payments to Madison, totaling at least $57,729,838. In 2017, JZS made a cash distribution of $50,011,660 to Madison.

In December 2014, a potential buyer offered $67,000,000 to purchase Penthouses One and Three. Straus rejected the combined offer, and the buyer later purchased Penthouse Three for $31,000,000. By December 2017, the Development was substantially completed and all Condo Units were sold, except for Penthouse One, which Straus had decided to retain for his personal use. Straus assigned Penthouse One a value of $25,000,000 for purpose of calculating the CUPI and PPI. The sales of the other units totaled $188,820,780. On December 28, 2017, JZS made a cash distribution in the form of PPI of $3,988,340.19 to D3N7. The amount of that payment was based in part on Straus's valuation of Penthouse One.

According to Neveloff, during discussions that took place in 2017 and 2018, he told Straus he was entitled to a CUPI payment. Neveloff asserted the $95 million acquisition cost of the Property should not be considered in calculating "the sum of any and all costs, expenses, expenditures and amount . . . paid or incurred by [JZS] in connection with the Development" in the CUPI

formula set forth in paragraph 1(a)(ii)(B) of the Original Agreement and, thus, he was owed approximately $3,929,359 in CUPI. JZS believed the $95 million acquisition cost should be considered in calculating "the sum of any and all costs, expenses, expenditures and amounts . . . paid or incurred by [JZS] in connection with the Development" in the CUPI formula and, thus, it did not owe Neveloff any CUPI.

On April 16, 2018, JZS and Madison filed a complaint in the Chancery Division against the Neveloff parties, seeking a declaratory judgment that the Neveloff parties had been paid in full pursuant to the Amended Agreement and Amended Operating Agreement. On June 21, 2018, the Neveloff parties filed a complaint in the Law Division against JZS and Straus for breach of contract for failing to pay CUPI and the full amount of PPI allegedly owed and breach of the implied covenant of good faith and fair dealing. They also claimed Straus and JZS were each other's alter ego and that Straus had breached the fiduciary duty he owed to D3N7 as JZS's manager and had induced JZS to breach the Original Agreement, the Amended Agreement, and the Amended Operating Agreement. In addition to compensatory damages, interest, and an award of counsel fees and costs, the Neveloff parties sought a declaratory judgment that JZS and Straus had to pay D3N7 five percent of any future distribution to JZS's members within

11

thirty days of the distribution. The court subsequently consolidated and transferred the lawsuits to the Law Division.

JZS and Straus moved for partial dismissal of the Neveloff complaint under Rule 4:6-2(e). In an April 11, 2019 order, the court granted in part and denied in part the motion, dismissing the breach-of-the-implied-covenant claim against JSZ and all of the claims against Straus, except the breach-of-fiduciary-duty claim.

On December 18, 2020, the JZS parties moved for summary judgment, seeking the declaratory judgment sought in the JZS complaint and the dismissal of the remaining claims in the Neveloff complaint. The JZS parties included in their motion papers portions of the transcript of Straus's deposition, in which he testified about why the acquisition cost should be included in calculating the CUPI formula and why Neveloff was not entitled to any CUPI compensation. On the same day, the Neveloff parties moved for partial summary judgment, seeking summary judgment on their breach-of-contract claim against JZS and an award of $3,544,927.85 to Neveloff in CUPI, summary judgment as to liability in favor of D3N7 on the breach-of-contract and declaratory-judgment claims regarding PPI, and dismissal of the JZS complaint. In opposition to the JZS parties' motion, the Neveloff parties submitted Neveloff's certification and

12

portions of the transcript of Neveloff's deposition, in which he testified about why the acquisition cost should not be included in calculating the CUPI formula and why he was entitled to CUPI compensation. The JZS parties submitted the certification of Matthew Marcos in further support of their motion. Marcos had been deposed as JZS's corporate representative. In his certification, he offered an explanation of what he had meant in his deposition testimony about acquisition cost, "hard and soft costs," and the calculation of the CUPI formula.

After hearing argument on March 15, 2021, the court placed a decision on the record granting in part and denying in part the motions. In that decision, the court stated "you could . . . say [Marcos] arguably tried to walk back some of [his] testimony in his subsequent certification" but did not "necessarily find his certification . . . [to be] a sham affidavit." The court found it "hard to believe that two sophisticated parties would both intend to include $95 million costs as a separate item and not [specifically] include it." The court opined "that the intent of these two sophisticated entities . . . w[as that acquisition costs were] never meant to be separately included in a CUPI calculation." The court concluded the parties had considered the acquisition costs to be part of the "hurdle" amount, which was $62,000,000 in the Original Agreement and increased to $88,105,263 in the Amended Agreement, and thus, had not included

13

it as a "cost." The court recognized that "quite frankly, it's not particularly clear, other than through forecasting done before the development was pursued—it had to be part of it. [The acquisition costs] simply had to be part of the hurdle." Despite that acknowledged lack of clarity, the court granted the aspect of the Neveloff parties' summary-judgment motion regarding their CUPI breach-of-contract claim and held JZS had breached the parties' contract by not paying CUPI compensation to Neveloff.

The court found a genuine issue of material fact existed as to whether JZS owed D3N7 additional PPI compensation and that the Neveloff parties' declaratory-judgment claim against JZS was premature. The court held the only issues for trial were "the fair market value" of Penthouse One, which could impact the amount of CUPI and PPI owed; whether D3N7 was entitled to additional compensation from JZS under the PPI breach-of-contract claim; and whether Straus had breached his fiduciary duty based on a failure to pay the full amount of PPI owed. On March 31, 2021, the court entered an order memorializing its decision, dismissing the JZS complaint in its entirety, dismissing the Neveloff parties' declaratory-judgment claim against JZS, granting the Neveloff parties' summary judgment on their CUPI breach-of-contract claim against JZS, and awarding Neveloff $3,544,927.85 on that claim.

14

The court did not award any prejudgment interest on that amount and made no reference to interest in the order.

The JZS parties subsequently moved for reconsideration. The court entered an order on July 2, 2021, denying the motion and, in an attached rider, finding the Marcos certification was a "sham" under Shelcusky v. Garjulio, 172 N.J. 185 (2002). On August 12, 2021, the Neveloff parties again moved for summary judgment, seeking an additional award of $410,200 in CUPI, summary-judgment on the PPI breach-of-contract claim against JZS and breach-of-fiduciary-duty claim against Straus, and a $1,328,435.70 damage award in favor of D3N7 on the PPI claims. After hearing argument, the court denied the motion in an October 19, 2021 order.

The Neveloff parties subsequently withdrew their jury demand, and, as memorialized in an October 21, 2022 consent order, the parties agreed the remaining claims would be tried by the court without a jury. In an October 31, 2022 consent order, the parties agreed the court would decide the remaining claims based on the documentary evidence, briefs, and deposition transcripts they had submitted and without any other testimony.

The Neveloff parties contended the distributions JZS had made to Madison in 2016 exceeded Madison's capital contribution by $9,466,316 and,

consequently, D3N7 was entitled to a PPI payment of five percent of that amount, or $473,315.80. They also contended Straus should be personally liable for failing to fulfill his fiduciary duty, as manager of JZS, to have JZS make mandatory distributions. The JZS parties asserted JZS owed D3N7 only $80,161.09 in PPI because the first two distributions made in 2016 did not exceed Madison's capital contribution. The Neveloff parties contended Penthouse One had a fair market value far in excess of the $25,000,000 value Straus had assigned to it. They contended the valuation should have been based on the "best offer number" of $36,000,000 for Penthouse One, purportedly embedded in the 2014 combined offer for Penthouses One and Three. The JZS parties asserted the court, for various reasons, should not use the 2014 combined offer to value Penthouse One at the time Straus decided to retain it in 2017.

After hearing argument and considering the parties' post-trial submissions, the court placed a decision on the record and entered an order on January 9, 2023, awarding D3N7 an $80,161.09 judgment against JZS on the PPI breach-of-contract claim, denying the Neveloff parties' claims for additional CUPI and PPI compensation based on Straus's retention of Penthouse One, and dismissing the breach-of-fiduciary-duty claim against Straus. The court rejected the Neveloff parties' "far too restrictive" interpretation of the Amended

16

Operating Agreement and characterization of JZS's distributions. The court also rejected the Neveloff parties' reliance on the 2014 "best offer" to value Penthouse One because the 2014 offer was a combined offer for two finished and adjacent units, Penthouse One was still on the market until 2017, and the Neveloff parties had not submitted expert testimony on the fair market value of the condominium. Accordingly, the court found D3N7 was not entitled to additional CUPI or PPI compensation based on the claim Straus should have assigned Penthouse One a higher value. The court held the Neveloff parties had not provided evidence Straus withheld payments from D3N7 intentionally or in bad faith and that Straus had not acted in bad faith by refusing "to pay amounts D3N7 contended it was owed when those amounts were disputed, especially [when] . . . the vast majority of D3N7's claim for additional compensation w[as] without merit." The court did not award any prejudgment interest on the $80,161.09 judgment and made no reference to interest in the order.

On February 21, 2023, the JZS parties filed a notice of appeal, stating they were appealing the portions of the March 31, 2021 order denying their motion for summary judgment and granting the Neveloff parties' motion for summary judgment on the Neveloff parties' CUPI breach-of-contract claim and the July 2, 2021 and January 9, 2023 orders. On March 7, 2023, the Neveloff parties

17

filed a notice of cross-appeal, stating they were appealing from the March 31, 2021, July 2, 2021, and January 9, 2023 orders.

On April 24, 2023, the Neveloff parties moved in the trial court for an order "enforcing" the March 31, 2021 and January 9, 2023 orders and "clarifying" them to add an award of prejudgment interest. JZS opposed the motion and cross-moved to stay the orders pending appeal pursuant to Rule 2:9-5.

After hearing argument, the court on August 17, 2023, entered an order with a rider granting the Neveloff parties' motion, awarding Neveloff $361,290.22 in prejudgment interest based on the March 31, 2021 order and D3N7 $12,131.67 in prejudgment interest based on the January 9, 2023 order, and staying execution of the orders on the posting of a supersedeas bond. The JZS parties subsequently filed an amended notice of appeal, including in their appeal the August 17, 2023 order.

II.

A.

We first consider the March 31, 2021 summary-judgment order. We review a trial court's order on summary judgment de novo and apply the same standard used by the trial court. Boyle v. Huff, 257 N.J. 468, 477 (2024). "In

ruling on a summary-judgment motion, a court does not 'weigh the evidence and determine the truth of the matter'; it only 'determine[s] whether there is a genuine issue for trial.'" C.V. ex rel. C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 305-06 (2023) (alteration in original) (quoting Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021)). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)).

If the "competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party," the movant is not entitled to summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also Globe Motor Co., 225 N.J. at 480. A court should grant summary judgment "[o]nly 'when the evidence is so one-sided that one party must prevail as a matter of law.'" Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 257 (2018) (quoting Brill, 142 N.J. at 540 (1995)) (internal quotation marks omitted). The Neveloff parties did not meet that standard in their summary-judgment motion because the contract

19

terms regarding the CUPI formula are ambiguous and genuine issues of material fact exist regarding the parties' intended meaning of those terms. Accordingly, we reverse the aspect of the March 31, 2021 order granting in part the Neveloff parties' summary-judgment motion regarding the CUPI breach-of-contract claim.

We analyze the parties' agreements under the familiar rules of contract interpretation. In doing so, "we 'pay no special deference to the trial court's interpretation and look at the contract with fresh eyes.'" Del. River Joint Toll Bridge Comm'n v. George Harms Const. Co., 258 N.J. 286, 303 (2024) (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)); see also Serico v. Rothberg, 234 N.J. 168, 178 (2018) ("In the absence of a factual dispute, we review the interpretation of a contract de novo").

When a court interprets a contract, "[t]he plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020) (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). However, "where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision

should be left to the jury," and summary judgment is improper.  Driscoll Constr. Co. v. State, Dep't of Transp., 371 N.J. Super. 304, 314 (App. Div. 2004) (quoting Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 502 (App. Div. 2000)); see also Manahawkin Convalescent v. O'Neill, 426 N.J. Super. 143, 151 (App. Div. 2012) (finding "[t]he interpretation of a contract is ordinarily a legal question for the court and may be decided on summary judgment unless 'there is uncertainty, ambiguity, or the need for parol evidence in aid of interpretation . . . .'" (quoting Celanese Ltd. v. Essex Cty. Improvement Auth., 404 N.J. Super. 514 (App. Div. 2009))).  In addition, "[d]isputes concerning intent or credibility ordinarily should not be resolved on summary judgment." N.J. Transit Corp. v. Certain Underwriters at Lloyd's London, 461 N.J. Super. 440, 463 (App. Div. 2019).

A contract term is ambiguous if it is "susceptible to at least two reasonable alternative interpretations."  Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008); see also Capparelli v. Lopatin, 459 N.J. Super. 584, 604 (App. Div. 2019) (same).  "[A] court may look to extrinsic evidence as an aid to interpretation" when there is ambiguity.  Chubb, 195 N.J. at 238. "When a contract is ambiguous in a material respect, the parties must be given the opportunity to illuminate the contract's meaning through the submission of

21

extrinsic evidence." Capparelli, 459 N.J. Super. at 604 (App. Div. 2019). Although extrinsic evidence cannot be used to modify the terms of an agreement, a court should consider all relevant evidence concerning the intent and meaning of the contract in attempting to resolve ambiguities. Ibid.

Applying those cornerstone rules of contract interpretation, we conclude the court erred in granting summary judgment on the Neveloff parties' CUPI breach-of-contract claim. As a threshold matter, the court erred in not finding ambiguous the applicable CUPI contract language in paragraph 1(a) of the Original Agreement and Amended Agreement. It is ambiguous. The JZS parties focus on the "any and all costs" language of that provision, arguing the acquisition costs are included in that broad phrase. The Neveloff parties emphasize the reference to "the Development," arguing the acquisition costs were incurred before "the Development" occurred and, thus, were not included in the CUPI formula. But the agreements do not contain a definition of "costs" or "hard and soft costs" or an explanation as to the meaning of the phrase "in connection with," which the precedes reference to "the Development."

Having made no finding the contract language was ambiguous, the court nevertheless used parol evidence in its attempt to discern the meaning of the contract terms and, in doing so, made credibility determinations regarding the

A-1794-22

testimony contained in the deposition transcripts and certifications on which the parties relied. The court rendered a conclusion as to what the parties had intended the "hurdle" amount to include, even though the agreements do not explain how the hurdle amount was calculated and witnesses presented conflicting testimony on that issue. And in its reconsideration decision, without explanation and without conducting an evidentiary hearing, the court changed its determination as to whether Marcos's certification was a "sham."

In the face of ambiguous contract language and conflicting testimony, the court improperly assumed the role of factfinder and failed to view the evidence in a light most favorable to the non-moving party. For these reasons, we reverse the aspect of the March 31, 2021 order granting summary judgment to the Neveloff parties on their CUPI breach-of-contract claim. We also reverse the July 2, 2021 order denying the JZS parties' reconsideration motion.

B.

We now turn to the cross-appeal of the January 9, 2023 order. "Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review." 160 W. Broadway Assocs., LP v. 1 Mem'l Drive, LLC, 466 N.J. Super. 600, 610 (App. Div. 2021) (quoting Seidman v. Clifton Sav. Bank, SLA, 205 N.J. 150, 169 (2011)). "[W]e do not

disturb the factual findings . . . of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice . . . ." Ibid. (quoting Seidman, 205 N.J. at 169). "In reviewing the judge's findings, '[w]e do not weigh the evidence . . . or make conclusions about the evidence.'" Ibid. (first alteration in original) (quoting Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008)). However, "we owe no deference to the judge's interpretation of the law and the legal consequences that flow from established facts." 160 W. Broadway Assocs., 466 N.J. Super. at 498 (citing Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Applying that standard, we affirm the January 9, 2023 order. We perceive no error in the court's interpretation of the PPI language contained in the Amended Operating Agreement and rejection of the Neveloff parties' "far too restrictive interpretation" of that agreement. The court's factual findings regarding PPI were supported by substantial evidence in the record and, thus, are not subject to reversal.

The court did not abuse its discretion in rejecting the Neveloff parties' judicial-estoppel argument. See Terranova v. Gen. Elec. Pension Tr., 457 N.J.

Super. 404, 410 (App. Div. 2019) (applying abuse-of-discretion standard of review when considering trial court's decision about whether to invoke judicial estoppel). "[J]udicial estoppel is 'an extraordinary remedy,' which should be invoked only 'when a party's inconsistent behavior will otherwise result in a miscarriage of justice.'" Ali v. Rutgers, 166 N.J. 280, 288 (2000) (quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3d Cir.1996)). As the court found, the Neveloff parties failed to meet that high standard.

We also perceive no error or abuse of discretion in the court's determination not to apply a portion of the combined 2014 offer for completed units to render a fair market value of Penthouse One. Whether valuing Penthouse One in 2015 or 2017, the Neveloff parties failed to demonstrate that a 2014 aggregate offer for two finished units should be used to value Penthouse One at a later time under different circumstances. Moreover, as the court found, the court was "not qualified to render an opinion on the fair market value of a multi-million dollar condominium unit in the heart of New York City in 2017." "Expert testimony is required 'where the fact[-]finder is not expected to have sufficient knowledge or experience and would have to speculate without the aid of expert testimony.'" Pansini Custom Design Assocs., LLC v. City of Ocean

City, 407 N.J. Super. 137, 143 (App. Div. 2009) (alteration in original) (quoting Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001)). "Expert testimony is generally required to determine the fair market value of real property . . . ." Ibid.; see also Jacobitti v. Jacobitti, 263 N.J. Super. 608, 613 (App. Div. 1993) (cautioning judges against fixing the market value of real estate without expert appraisal), aff'd, 135 N.J. 571 (1994). "[F]air market value may be demonstrated by other types of evidence, including the existence of an arms-length agreement to purchase the same property at or about the same time of the inquiry . . . ." Brunswick Bank & Trust v. Heln Mgmt. LLC, 453 N.J. Super. 324, 337 (App. Div. 2018). But we didn't have that here. Contrary to the Neveloff parties' assertion, there was never a "bona-fide offer" for Penthouse One. There was an aggregate offer for two units and an offer for Penthouse Three. As the court held, it could not "simply separate the two components of [the] combined offer to manufacture an offer for Penthouse One that never existed." Without expert testimony or "the existence of an arms-length agreement to purchase the same property at or about the same time," ibid., the court correctly rejected the Neveloff parties' assertions regarding the valuation of Penthouse One and their argument that it should award additional CUPI and PPI based on those assertions.

A-1794-22

For these reasons, we affirm the January 9, 2023 order.

C.

Finally, we consider the August 17, 2023 order awarding prejudgment interest. Pursuant to Rule 2:9-1(a), absent limited exceptions, "the supervision and control of the proceedings on appeal . . . shall be in the appellate court from the time the appeal is taken . . . ." State v. Washington, 453 N.J. Super. 164, 204 (App. Div. 2018) (quoting R. 2:9-1(a)). In other words, "once an appeal is filed, the trial court loses jurisdiction to make substantive rulings in the matter." McNair v. McNair, 332 N.J. Super. 195, 199 (App. Div. 2000). However, certain matters may remain under the trial court's jurisdiction if specifically permitted by rule or statute. See, e.g., R. 2:9-3 (stay pending review in criminal actions), R. 2:9-4 (bail), R. 2:9-5 (stay pending appeal), R. 2:9-7 (temporary relief in administrative proceedings), R. 2:9-13(f) (appeals from orders granting pretrial detention), and R. 3:21-10 (reduction or change of sentence).

The trial court retains continuing jurisdiction over the enforcement of judgments and orders pursuant to Rule 1:10. Van Horn v. Van Horn, 415 N.J. Super. 398, 410 (App. Div. 2010) (quoting R. 2:9-1(a)). A trial court's continuing jurisdiction also includes the power to correct "a conceded error in the order or judgment." McNair, 332 N.J. Super. at 199. That authority is

codified under Rule 1:13-1, which allows a court to correct "[c]lerical mistakes" in judgments or orders "notwithstanding the pendency of an appeal." Clerical errors may include "misspellings; administrative mistakes; typographical errors and errors in transposing; or mathematical miscalculations." Borromeo v. DiFlorio, 409 N.J. Super. 124, 140 (App. Div. 2009) (internal citations omitted). However, "[t]his rule clearly provides no authority for the trial court's reconsideration of its own orders and judgments." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R.1:13-1 (2025). Thus, "[e]xcept to the extent of enforcement or correction . . . the ordinary effect of the filing of the notice of appeal is to deprive the court below of jurisdiction to act further in the matter under appeal unless directed to do so by the appellate court." Id., cmt. 1 on R. 2:9-1(a).

The Neveloff parties argue that in their post-appeal motion, they were merely seeking clarification of the court's orders. But there was nothing to clarify. The court had made no reference whatsoever to interest in its orders. And the Neveloff parties were not simply attempting to enforce the orders. They were seeking an additional award of prejudgment interest on the judgments entered by the court. See Heim v. Wolpaw, 271 N.J. Super. 538, 541 (App. Div. 1994) (finding parties moving to clarify a judgment and cross-moving to correct

a purported clerical mistake regarding prejudgment interest were actually seeking relief from the judgment under Rule 4:50). Before seeking that relief from the trial court, the Neveloff parties had to file a motion for leave to do so with this court. See Soc'y Hill Condo. Ass'n, Inc. v. Soc'y Hill Assocs., 347 N.J. Super. 163, 177 (App. Div. 2002) (finding "applications in the trial court to modify the judgment" after a direct appeal has been filed "may only occur with leave of the appellate court"). Because of the pending appeal and cross-appeal, the trial court did not have jurisdiction to award the additional relief of prejudgment interest. Accordingly, we reverse the August 17, 2023 order awarding prejudgment interest.

D.

In sum, we reverse the aspect of the March 31, 2021 order granting summary judgment to the Neveloff parties on their CUPI breach-of-contract claim. We also reverse the July 2, 2021 order denying the JZS parties' reconsideration motion and the August 17, 2023 order awarding prejudgment interest. We affirm the January 9, 2023 order.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-1794-22